

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**RECEIVED**

DEC 2 0 2007
DEC 26 2007

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**Ronald Anthony Levi**

_____

_____

(Enter above the full name
of the plaintiff or plaintiffs in
this action)

07CV7222
JUDGE ASPEN
MAGISTRATE JUDGE NOLAN

Case No:_____
(To be supplied by the <u>Clerk of this Court</u>)

vs.

**State of Illinois**
**The Attorney General**
**Lisa Madigan**
**IDOC Director**

**DHS Director**
**Carol Adams**

**Larry J. Phillips**
**Shawn Jumper**

(Enter above the full name of ALL
defendants in this action.  <u>Do not</u>
use "et al.")

**CHECK ONE ONLY:**

✔        COMPLAINT UNDER THE CIVIL RIGHTS ACT, TITLE 42 SECTION 1983
        U.S. Code (state, county, or municipal defendants)

_____        COMPLAINT UNDER THE CONSTITUTION ("BIVENS" ACTION), TITLE
        28 SECTION 1331(a) U.S. Code (federal defendants)

        OTHER (cite statute, if known)

*BEFORE FILLING OUT THIS COMPLAINT, PLEASE REFER TO "INSTRUCTIONS FOR
FILING." FOLLOW THESE INSTRUCTIONS CAREFULLY.*

Revised 4/01

1

**I.    Plaintiff(s):**

A.    Name:    RONALD LEVI

B.    List all aliases:    RONALD LEWIS
      CIVIL Detainee

C.    Prisoner identification number:    871231

D.    Place of present confinement:    D.H.S.

E.    Address:    RRI BOX 6A, Rushville, IL 62681

(If there is more than one plaintiff, then each plaintiff must list his or her name, aliases,
I.D. number, and current address according to the above format on a separate sheet of
paper.)

**II.    Defendant(s):**
(In **A** below, place the full name of the first defendant in the first blank, his or her official
position in the second blank, and his or her place of employment in the third blank.  Space
for two additional defendants is provided in **B** and **C**.)

A.    Defendant:    LISA Madigan

      Title:    Attorney General

      Place of Employment:    State of Illinios

B.    Defendant:    Carol Adams

      Title:    Secretary

      Place of Employment:    D.H.S.

C.    Defendant:    _____

      Title:    Director of I.DO.C.

      Place of Employment:    I.DO.C.

(If you have more than three defendants, then all additional defendants must be listed
according to the above format on a separate sheet of paper.)

Revised 4/01

2

### III.  Exhaustion of Administrative Remedies

You are required to exhaust all your available administrative remedies before bringing an action in federal court.

A.  Is there a grievance procedure available at your institution?

YES ( ✓ )  NO ( )   If there is no grievance procedure, skip to F.

B.  Have you filed a grievance concerning the facts in this complaint?

YES ( ✓ )  NO ( )

C.  If your answer is **YES**:

1.  What steps did you take?

I file A greuance denied

2.  What was the result?  denied

3.  If the grievance was not resolved to your satisfaction, did you appeal?

What was the result (if there was no procedure for appeal, so state.)

yes

D.  If your answer is **NO**, explain why not:

E.    Is the grievance procedure now completed?   YES ( ✓ )   NO ( )

F.    If there is no grievance procedure in the institution, did you complain to authorities?   YES ( )   NO ( )

G.    If your answer is **YES**:

1.    What steps did you take?

_____

_____

_____

2.    What was the result?

_____

_____

_____

H.    If your answer is **NO**, explain why not:

_____

_____

_____

_____

Revised 4/01

**IV.** List ALL lawsuits you (and your co-plaintiffs, if any) have filed in any state or federal court (including the Central and Southern Districts of Illinois): *CASE 07-3328*

A. Name of case and docket number: Ronald Levi V. Terry William
Ronald Levi V. Mercer case# 07-3304

B. Approximate date of filing lawsuit: 9-07    10-7

C. List all plaintiffs (if you had co-plaintiffs), including any aliases: _____

_____

_____

_____

D. List all defendants: Shawn Jumper, Diana Doeb eien
E. Biermann, Brian Thomas, Sandra Simpson
Chad oberhausen, Terry william

E. Court in which the lawsuit was filed (if federal court, name the district; if state court, name the county): Central District Illinois

F. Name of judge to whom case was assigned: Baker

G. Basic claim made: Seizer of legal paper, redeer of Grievance
I was lied on and pertali for something I did
Not do

H. Disposition of this case (for example: Was the case dismissed? Was it appealed? Is it still pending?): pending _____

_____

_____

H. Approximate date of disposition: _____

**IF YOU HAVE FILED MORE THAN ONE LAWSUIT, THEN YOU MUST DESCRIBE THE ADDITIONAL LAWSUITS ON ANOTHER PIECE OF PAPER, USING THIS SAME FORMAT. REGARDLESS OF HOW MANY CASES YOU HAVE PREVIOUSLY FILED, YOU WILL NOT BE EXCUSED FROM FILLING OUT THIS SECTION COMPLETELY, AND FAILURE TO DO SO MAY RESULT IN DISMISSAL OF YOUR CASE. CO-PLAINTIFFS MUST ALSO LIST ALL CASES THEY HAVE FILED.**

IN 1982, the Washington Supreme court rejected the Notion that the "CIVIL" label predetermines the applicable right when it said that [W]hile those labels are convenient tools for conveying a general conception, in this setting they are at best conclusory, Courts should not permit themselves to be so mesmerized as to percieve Nothing but the labels.

Label and mere Analogies do Not provide Adequate answer to the problem facing us. Legal fiction should Not be employed to rationalize the rejection of Constitutional safeguards where individual liberty is at stake. This is particularly True when those legal fiction challenge and do violence to reason." See State v. Rinaldo, 98 WN. 2d 419, 426, 655 P.2d 1141 (wash. 1982).

However, Allan L. Schwartz has explained that the Civil-Criminal reasoning" is unavailable to the court where the provision for a Sexual psychopathy proceeding is contained in an Amendment to a criminal Code, And it has been held that such an Amendment providing for more than one proceeding was <u>unconstitutional "as violative of due process</u>" See Allan L. Schwartz, JD., Applicability, in proceedings under Statutes Relating to Sexual psychopaths, of Constitutional Provisions for the protection of a person, 34 A.L.R. 3d 652 (1971)

This Same reasoning was part of a 1973 decision of a federal District Court in Alabama which held that Alabama's sexual psychopath statute, providing for indeterminate confinement and transfers between mental and penal institutions constituted <u>unconstitutional denial of due process</u> and was also <u>unconstitutional</u> in that it either subjected person to two criminal proceeding, and possibly two criminal Sentences, for a Single Statutory crime, or, if not for a Single offense, then in one of two proceeding for mere crime of having mental disorder. "see" DAVY V. SULLIVAN, 354 f. Supp. 1320, 1324-30 (N.D. Ala 1973) (citing Annotation).

Likewise, the <u>Ninth Circuit</u> Court of Appeal recently reiterated Similar language when it held that the Alaska Sex offender registration Act resulted in imposition of punishment So that the ex post facto clause prohibited retro-active Application of the Act. "see" Doe V Otte, 248 F. 3d 832 (9th Cir. 2001)

The <u>Ninth Circuit</u> highly criticized the fact that certain portion of the "Alaska Sex offender registration Act" were placed in the Alaska Criminal Code and relied on the <u>United States Supreme Court</u> decision in <u>Kansas V. Hendricks</u> when explaining that one factor recently relied upon by the <u>Supreme Court</u> in determining whether a

legislature intended a statute for sexual predators, the Court explained that the State code: "[w]hen considering a civil commitment statute for sexual predators, the Court explained that the State's intent was not punitive on the basis of the fact that the provision was placed in the State civil code, rather than in its criminal code." See" Doe v Otte, 248 F.3d At 839 (citing Kansas v. Hendricks. 521 U.S. 346, 361, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). Likewise, in 1938, a sharply divided Michigan Supreme Court, panel held an amendment to that State Sexual psychopath statute to be unconstitutional based on the ground that it was part of an amendment to the Code of Criminal Procedure which it purported to Amend." See" people v frontczak, 286 mich 51, 281 NW 534 (1938)

If the Illinois legislature intented the S.V.P. Act to be truely civil it would be founded in the Civil Code; But their intent was that they created a criminal statutes that would pretent to be civil which is in violatio of the US const amend 14 Due process clause

The Equal protection clause is "to do away with all governmentally imposed discrimination, "See" Palmore V. Sidoti, 466 U.S. 429, 432, 104 S.Ct 1879, 1881-82, 80 L.3d.2d 421 (1984)

sion to other persons or circumstances, shall not be affected thereby.

Laws 1938, First Sp.Sess., p. 28, § 11, added by Laws 1955, p. 1144, § 1, eff. July 7, 1955.

Formerly Ill.Rev.Stat.1991, ch. 38, ¶ 105–11, transferred from Ill.Rev.Stat.1961, ch. 38, ¶ 825d.

## 205/12.  Custody transferred from Department of Public Safety to Director of Corrections

§ 12.  Persons heretofore committed to the Department of Public Safety are deemed transferred and committed to the custody of the Director of Corrections.

Laws 1938, First Sp.Sess., p. 28, § 12, added by Laws 1955, p. 1144, § 1, eff. July 7, 1955.  Amended by P.A. 76–451, § 1, eff. Jan. 1, 1970.

Formerly Ill.Rev.Stat.1991, ch. 38, ¶ 105–12, transferred from Ill.Rev.Stat.1961, ch. 38, ¶ 825e.

## ACT 207.  SEXUALLY VIOLENT PERSONS COMMITMENT ACT

Section
207/1.    Short title.
207/5.    Definitions.
207/10.   Notice to the Attorney General and State's Attorney.
207/15.   Sexually violent person petition; contents; filing.
207/15.   Sexually violent person petition; contents; filing.
207/20.   Civil nature of proceedings.
207/25.   Rights of persons subject to petition.
207/30.   Detention;  probable cause hearing;  transfer for examination.
207/35.   Trial.
207/40.   Commitment.
207/45.   Deoxyribonucleic acid analysis requirements.
207/50.   Secure facility for sexually violent persons.
207/55.   Periodic reexamination; report.
207/60.   Petition for conditional release.
207/65.   Petition for discharge; procedure.
207/70.   Additional petitions for discharge.
207/75.   Notice concerning conditional release, discharge, escape, death, or court-ordered change in the custody status of a detainee or civilly committed sexually violent person.
207/75.   Notice concerning conditional release, discharge, escape, death, or court-ordered change in the custody status of a detainee or civilly committed sexually violent person.
207/80.   Applicability.
207/90.   Committed persons ability to pay for services.
207/99.   Effective date.

## 207/1.  Short title

§ 1.  Short title.  This Act may be cited as the Sexually Violent Persons Commitment Act.

P.A. 90–40, § 1, eff. Jan. 1, 1998.

Title of Act:

An Act in relation to sexually violent persons.  P.A. 90–40, approved June 30, 1997, eff. Jan. 1, 1998.

## 207/5.  Definitions

§ 5.  Definitions.  As used in this Act, the term:

(a) "Department" means the Department of Human Services.

(b) "Mental disorder" means a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence.

(c) "Secretary" means the Secretary of Human Services.

(d) "Sexually motivated" means that one of the purposes for an act is for the actor's sexual arousal or gratification.

(e) "Sexually violent offense" means any of the following:

(1. Any crime specified in Section 12–13, 12–14, 12–14.1, or 12–16 of the Criminal Code of 1961;[1] or

(1.5) Any former law of this State specified in Section 11–1 (rape), 11–3 (deviate sexual assault), 11–4 (indecent liberties with a child) or 11–4 (aggravated indecent liberties with a child) of the Criminal Code of 1961;[2] or

(2) First degree murder, if it is determined by the agency with jurisdiction to have been sexually motivated; or

(3) Any solicitation, conspiracy or attempt to commit a crime under paragraph (e)(1) or (e)(2) of this Section.

(f) "Sexually violent person" means a person who has been convicted of a sexually violent offense, has been adjudicated delinquent for a sexually violent offense, or has been found not guilty of a sexually violent offense by reason of insanity and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence.

P.A. 90–40, § 5, eff. Jan. 1, 1998.  Amended by P.A. 90–793, § 20, eff. Aug. 14, 1998; P.A. 91–875, § 5, eff. June 30, 2000.

[1] 720 ILCS 5/12–13, 720 ILCS 5/12–14, 720 ILCS 5/12–14.1 or 720 ILCS 5/12–16.

[2] 720 ILCS 5/1–1 et seq.

## 207/10.  Notice to the Attorney General and State's Attorney

§ 10.  Notice to the Attorney General and State's Attorney.

(a) In this Act, "agency with jurisdiction" means the agency with the authority or duty to release or discharge the person.

(b) If an agency with jurisdiction has control or custody over a person who may meet the criteria for commitment as a sexually violent person, the agency with jurisdiction shall inform the Attorney General and the State's Attorney in a position to file a petition under paragraph (a)(2) of Section 15 of this Act regarding the person as soon as possible beginning 3 months prior to the applicable date of the:

(1) The anticipated release from imprisonment or the anticipated entry into mandatory supervised release of a person who has been convicted of a sexually violent offense.

(2) The anticipated release from a Department of Corrections correctional facility or juvenile correctional facility of a person adjudicated delinquent under Section 5–20 of the Juvenile Court Act of 1987[1] (now repealed) or found guilty under Section 5–620 of that Act, on the basis of a sexually violent offense.

(3) The discharge or conditional release of a person who has been found not guilty of a sexually violent offense by reason of insanity under Section 5–2–4 of the Unified Code of Corrections.[2]

(c) The agency with jurisdiction shall provide the Attorney General and the State's Attorney with all of the following:

*D n r- een t* **tion**

*• of this meant discharge from prison*
*why doesn't it say so.*

(1) The person's name, identifying factors, anticipated future residence and offense history;

(2) A comprehensive evaluation of the person's mental condition, the basis upon which a determination has been made that the person is subject to commitment under subsection (b) of Section 15 of this Act and a recommendation for action in furtherance of the purposes of this Act. The evaluation shall be conducted in conformance with the standards developed under the Sex Offender Management Board Act and by an evaluator approved by the Board; and

(3) If applicable, documentation of any treatment and the person's adjustment to any institutional placement.

(d) Any agency or officer, employee or agent of an agency is immune from criminal or civil liability for any acts or omissions as the result of a good faith effort to comply with this Section.

P.A. 90-40, § 10, eff. Jan. 1, 1998. Amended by P.A. 90-793, § 20, eff. Aug. 14, 1998; P.A. 91-357, § 246, eff. July 29, 1999; P.A. 93-616, § 20, eff. Jan. 1, 2004.

1 705 ILCS 405/5-20.
2 730 ILCS 5/5-2-4.

**207/15.** Sexually violent person petition; contents; filing

*Text of section effective until June 1, 2006*

§ 15. Sexually violent person petition; contents; filing.

(a) A petition alleging that a person is a sexually violent person may be filed by:

(1) The Attorney General, at the request of the agency with jurisdiction over the person, as defined in subsection (a) of Section 10 of this Act, or on his or her own motion. If the Attorney General, after consulting with and advising the State's Attorney of the county referenced in paragraph (a)(2) of this Section, decides to file a petition under this Section, he or she shall file the petition before the date of the release or discharge of the person or within 30 days of placement onto parole or mandatory supervised release for an offense enumerated in paragraph (e) of Section 5 of this Act.

(2) If the Attorney General does not file a petition under this Section, the State's Attorney of the county in which the person was convicted of a sexually violent offense, adjudicated delinquent for a sexually violent offense or found not guilty of or not responsible for a sexually violent offense by reason of insanity, mental disease, or mental defect may file a petition.

(3) The Attorney General and the State's Attorney referenced in paragraph (a)(2) of this Section jointly.

(b) A petition filed under this Section shall allege that all of the following apply to the person alleged to be a sexually violent person:

(1) The person satisfies any of the following criteria:

(A) The person has been convicted of a sexually violent offense;

(B) The person has been found delinquent for a sexually violent offense; or

(C) The person has been found not guilty of a sexually violent offense by reason of insanity, mental disease, or mental defect.

(2) (Blank).

(3) (Blank).

(4) The person has a mental disorder.

(5) The person is dangerous to others because the person's mental disorder creates a substantial probability that he or she will engage in acts of sexual violence.

(b-5) The petition must be filed:

(1) No more than 90 days before discharge or entry into mandatory supervised release from a Department of Corrections correctional facility for a sentence that was imposed upon a conviction for a sexually violent offense, or for a sentence that is being served concurrently or consecutively with a sexually violent offense, and no more than 30 days after the person's entry into parole or mandatory supervised release; or

(2) No more than 90 days before discharge or release:

(A) from a Department of Corrections juvenile correctional facility if the person was placed in the facility for being adjudicated delinquent under Section 5-20 of the Juvenile Court Act of 1987 1 or found guilty under Section 5-620 of that Act 2 on the basis of a sexually violent offense; or

(B) from a commitment order that was entered as a result of a sexually violent offense.

(c) A petition filed under this Section shall state with particularity essential facts to establish probable cause to believe the person is a sexually violent person. If the petition alleges that a sexually violent offense or act that is a basis for the allegation under paragraph (b)(1) of this Section was an act that was sexually motivated as provided under paragraph (e)(2) of Section 5 of this Act, the petition shall state the grounds on which the offense or act is alleged to be sexually motivated.

(d) A petition under this Section shall be filed in either of the following:

(1) The circuit court for the county in which the person was convicted of a sexually violent offense, adjudicated delinquent for a sexually violent offense or found not guilty of a sexually violent offense by reason of insanity, mental disease or mental defect.

(2) The circuit court for the county in which the person is in custody under a sentence, a placement to a Department of Corrections correctional facility or juvenile correctional facility, or a commitment order.

P.A. 90-40, § 15, eff. Jan. 1, 1998. Amended by P.A. 90-793, § 20, eff. Aug. 14, 1998; P.A. 91-227, § 5, eff. Jan. 1, 2000; P.A. 91-357, § 246, eff. July 29, 1999; P.A. 92-16, § 90.5, eff. June 28, 2001.

1 705 ILCS 405/5-20.
2 705 ILCS 405/5-620.

*For text of section effective June 1, 2006, see 725 ILCS 207/15, post*

**207/15.** Sexually violent person petition; contents; filing

*Text of section effective June 1, 2006*

§ 15. Sexually violent person petition; contents; filing.

(a) A petition alleging that a person is a sexually violent person may be filed by:

(1) The Attorney General, at the request of the agency with jurisdiction over the person, as defined in subsection (a) of Section 10 of this Act, or on his or her own motion. If the Attorney General, after consulting with and advising the State's Attorney of the county referenced in paragraph (a)(2) of this Section, decides to file a petition under this Section, he or she shall file the petition before the date of

725 ILCS 207/15          CRIMINAL PROCEDURE          760

the release or discharge of the person or within 30 days of placement onto parole or mandatory supervised release for an offense enumerated in paragraph (e) of Section 5 of this Act.

(2) If the Attorney General does not file a petition under this Section, the State's Attorney of the county in which the person was convicted of a sexually violent offense, adjudicated delinquent for a sexually violent offense or found not guilty of or not responsible for a sexually violent offense by reason of insanity, mental disease, or mental defect may file a petition.

(3) The Attorney General and the State's Attorney referenced in paragraph (a)(2) of this Section jointly.

(b) A petition filed under this Section shall allege that all of the following apply to the person alleged to be a sexually violent person:

(1) The person satisfies any of the following criteria:

(A) The person has been convicted of a sexually violent offense;

(B) The person has been found delinquent for a sexually violent offense; or

(C) The person has been found not guilty of a sexually violent offense by reason of insanity, mental disease, or mental defect.

(2) (Blank).

(3) (Blank).

(4) The person has a mental disorder.

(5) The person is dangerous to others because the person's mental disorder creates a substantial probability that he or she will engage in acts of sexual violence.

(b–5) The petition must be filed:

(1) No more than 90 days before discharge or entry into mandatory supervised release from a Department of Corrections correctional facility for a sentence that was imposed upon a conviction for a sexually violent offense, or for a sentence that is being served concurrently or consecutively with a sexually violent offense, and no more than 30 days after the person's entry into parole or mandatory supervised release; or

(2) No more than 90 days before discharge or release:

(A) from a Department of Juvenile Justice juvenile correctional facility if the person was placed in the facility for being adjudicated delinquent under Section 5–20 of the Juvenile Court Act of 1987 [1] or found guilty under Section 5–620 of that Act [2] on the basis of a sexually violent offense; or

(B) from a commitment order that was entered as a result of a sexually violent offense.

(c) A petition filed under this Section shall state with particularity essential facts to establish probable cause to believe the person is a sexually violent person. If the petition alleges that a sexually violent offense or act that is a basis for the allegation under paragraph (b)(1) of this Section was an act that was sexually motivated as provided under paragraph (e)(2) of Section 5 of this Act, the petition shall state the grounds on which the offense or act is alleged to be sexually motivated.

(d) A petition under this Section shall be filed in either of the following:

(1) The circuit court for the county in which the person was convicted of a sexually violent offense, adjudicated delinquent for a sexually violent offense or found not guilty

of a sexually violent offense by reason of insanity, mental disease or mental defect.

(2) The circuit court for the county in which the person is in custody under a sentence, a placement to a Department of Corrections correctional facility or a Department of Juvenile Justice juvenile correctional facility, or a commitment order.

P.A. 90–40, § 15, eff. Jan. 1, 1998. Amended by P.A. 90–793, § 20, eff. Aug. 14, 1998; P.A. 91–227, § 5, eff. Jan. 1, 2000; P.A. 91–357, § 246, eff. July 29, 1999; P.A. 92–16, § 90.5, eff. June 28, 2001; P.A. 94–696, § 22, eff. June 1, 2006.

[1] 705 ILCS 405/5–20.
[2] 705 ILCS 405/5–620.

*For text of section effective until June 1, 2006, see 725 ILCS 207/15, ante*

**207/20.   Civil nature of proceedings**

§ 20.   Civil nature of proceedings.   The proceedings under this Act shall be civil in nature.   The provisions of the Civil Practice Law,[1] and all existing and future amendments of that Law shall apply to all proceedings hereunder except as otherwise provided in this Act.

P.A. 90–40, § 20, eff. Jan. 1, 1998.

[1] 735 ILCS 5/2–101 et seq.

**207/25.   Rights of persons subject to petition**

§ 25.   Rights of persons subject to petition.

(a) Any person who is the subject of a petition filed under Section 15 of this Act shall be served with a copy of the petition in accordance with the Civil Practice Law.[1]

(b) The circuit court in which a petition under Section 15 of this Act is filed shall conduct all hearings under this Act. The court shall give the person who is the subject of the petition reasonable notice of the time and place of each such hearing.   The court may designate additional persons to receive these notices.

(c) Except as provided in paragraph (b)(1) of Section 65 and Section 70 of this Act, at any hearing conducted under this Act, the person who is the subject of the petition has the right:

(1) To be present and to be represented by counsel.   If the person is indigent, the court shall appoint counsel.

(2) To remain silent.

(3) To present and cross-examine witnesses.

(4) To have the hearing recorded by a court reporter.

(d) The person who is the subject of the petition, the person's attorney, the Attorney General or the State's Attorney may request that a trial under Section 35 of this Act be to a jury.   A verdict of a jury under this Act is not valid unless it is unanimous.

(e) Whenever the person who is the subject of the petition is required to submit to an examination under this Act, he or she may retain experts or professional persons to perform an examination.   If the person retains a qualified expert or professional person of his or her own choice to conduct an examination, the examiner shall have reasonable access to the person for the purpose of the examination, as well as to the person's past and present treatment records and patient health care records.   If the person is indigent, the court shall, upon the person's request, appoint a qualified and available expert or professional person to perform an examination.   Upon the order of the circuit court, the county shall pay, as part of the costs of the action, the costs of a court-appointed expert or professional person to perform an examination and participate in the trial on behalf of an indigent person.

P.A. 90-40, § 25, eff. Jan. 1, 1998. Amended by P.A. 93-616, § 20, eff. Jan. 1, 2004; P.A. 93-970, § 5, eff. Aug. 20, 2004.
) 735 ILCS 5/2-101 et seq.
. P.A. 93-970 incorporated the amendment by P.A. 93-616.

## 207/30. Detention; probable cause hearing; transfer for examination

§ 30. Detention; probable cause hearing; transfer for examination.

(a) Upon the filing of a petition under Section 15 of this Act, the court shall review the petition to determine whether to issue an order for detention of the person who is the subject of the petition. The person shall be detained only if there is cause to believe that the person is eligible for commitment under subsection (f) of Section 35 of this Act. A person detained under this Section shall be held in a facility approved by the Department. If the person is serving a sentence of imprisonment, is in a Department of Corrections correctional facility or juvenile correctional facility or is committed to institutional care, and the court orders detention under this Section, the court shall order that the person be transferred to a detention facility approved by the Department. A detention order under this Section remains in effect until the person is discharged after a trial under Section 35 of this Act or until the effective date of a commitment order under Section 40 of this Act, whichever is applicable.

(b) Whenever a petition is filed under Section 15 of this Act, the court shall hold a hearing to determine whether there is probable cause to believe that the person named in the petition is a sexually violent person. If the person named in the petition is in custody, the court shall hold the probable cause hearing within 72 hours after the petition is filed, excluding Saturdays, Sundays and legal holidays. The court may grant a continuance of the probable cause hearing for no more than 7 additional days upon the motion of the respondent, for good cause. If the person named in the petition has been released, is on parole, is on mandatory supervised release, or otherwise is not in custody, the court shall hold the probable cause hearing within a reasonable time after the filing of the petition. At the probable cause hearing, the court shall admit and consider all relevant hearsay evidence.

(c) If the court determines after a hearing that there is probable cause to believe that the person named in the petition is a sexually violent person, the court shall order that the person be taken into custody if he or she is not in custody and shall order the person to be transferred within a reasonable time to an appropriate facility for an evaluation as to whether the person is a sexually violent person. If the person who is named in the petition refuses to speak to, communicate with, or otherwise fails to cooperate with the examining evaluator from the Department of Human Services or the Department of Corrections, that person may only introduce evidence and testimony from any expert or professional person who is retained or court-appointed to conduct an examination of the person that results from a review of the records and may not introduce evidence resulting from an examination of the person. Notwithstanding the provisions of Section 10 of the Mental Health and Developmental Disabilities Confidentiality Act,[1] all evaluations conducted pursuant to this Act and all Illinois Department of Corrections treatment records shall be admissible at all proceedings held pursuant to this Act, including the probable cause hearing and the trial.

If the court determines that probable cause does not exist to believe that the person is a sexually violent person, the court shall dismiss the petition.

(d) The Department shall promulgate rules that provide the qualifications for persons conducting evaluations under subsection (c) of this Section.

(e) If the person named in the petition claims or appears to be indigent, the court shall, prior to the probable cause hearing under subsection (b) of this Section, appoint counsel. P.A. 90-40, § 30, eff. Jan. 1, 1998. Amended by P.A. 92-415, § 15, eff. Aug. 17, 2001; P.A. 93-616, § 20, eff. Jan. 1, 2004; P.A. 93-970, § 5, eff. Aug. 20, 2004.
1 740 ILCS 110/10.

### Validity

*Subsection (c), which prohibits a person who is the subject of a commitment petition from presenting his or her own expert testimony if the person failed to cooperate with a State-conducted evaluation but which does not prohibit the State from presenting expert testimony based upon an examination of the person's records, violates the due process guarantees of the Fourteenth Amendment to the U.S. Constitution and Ill. Const. Art. I, § 2 as applied to a person against whom the State does present testimony. In re Detention of Kortte, 317 Ill.App.3d 111, 788 N.E.2d 988, 250 Ill.Dec. 514, and In re Detention of Trevino, 317 Ill.App.3d 324, 740 N.E.2d 810, 251 Ill.Dec. 524.*

P.A. 93-970 incorporated the amendment by P.A. 93-616.

## 207/35. Trial

§ 35. Trial.

(a) A trial to determine whether the person who is the subject of a petition under Section 15 of this Act is a sexually violent person shall commence no later than 120 days after the date of the probable cause hearing under Section 30 of this Act. Delay is considered to be agreed to by the person unless he or she objects to the delay by making a written demand for trial or an oral demand for trial on the record. Delay occasioned by the person temporarily suspends for the time of the delay the period within which a person must be tried. If the delay occurs within 21 days after the end of the period within which a person must be tried, the court may continue the cause on application of the State for not more than an additional 21 days beyond the period prescribed. The court may grant a continuance of the trial date for good cause upon its own motion, the motion of any party or the stipulation of the parties, provided that any continuance granted shall be subject to Section 103-5 of the Code of Criminal Procedure of 1963.[1]

(b) At the trial on the petition it shall be competent to introduce evidence of the commission by the respondent of any number of crimes together with whatever punishments, if any, were imposed. The petitioner may present expert testimony from both the Illinois Department of Corrections evaluator and the Department of Human Services psychologist.

(c) The person who is the subject of the petition, the person's attorney, the Attorney General or the State's Attorney may request that a trial under this Section be by a jury. A request for a jury trial under this subsection shall be made within 10 days after the probable cause hearing under Section 30 of this Act. If no request is made, the trial shall be by the court. The person, the person's attorney or the Attorney General or State's Attorney, whichever is applicable, may withdraw his or her request for a jury trial.

(d) (1) At a trial on a petition under this Act, the petitioner has the burden of proving the allegations in the petition beyond a reasonable doubt.

(2) If the State alleges that the sexually violent offense or act that forms the basis for the petition was an act that was sexually motivated as provided in paragraph (e)(2) of Section 5 of this Act, the State is required to prove beyond

**725 ILCS 207/35**　　CRIMINAL PROCEDURE

a reasonable doubt that the alleged sexually violent act was sexually motivated.

(e) Evidence that the person who is the subject of a petition under Section 15 of this Act was convicted for or committed sexually violent offenses before committing the offense or act on which the petition is based is not sufficient to establish beyond a reasonable doubt that the person has a mental disorder.

(f) If the court or jury determines that the person who is the subject of a petition under Section 15 is a sexually violent person, the court shall enter a judgment on that finding and shall commit the person as provided under Section 40 of this Act. If the court or jury is not satisfied beyond a reasonable doubt that the person is a sexually violent person, the court shall dismiss the petition and direct that the person be released unless he or she is under some other lawful restriction.

(g) A judgment entered under subsection (f) of this Section on the finding that the person who is the subject of a petition under Section 15 is a sexually violent person is interlocutory to a commitment order under Section 40 and is reviewable on appeal.

P.A. 90–40, § 35, eff. Jan. 1, 1998. Amended by P.A. 91–875, § 5, eff. June 30, 2000; P.A. 92–415, § 15, eff. Aug. 17, 2001.

1 725 ILCS 5/103–5.

## 207/40. Commitment

§ 40. Commitment.

(a) If a court or jury determines that the person who is the subject of a petition under Section 15 of this Act is a sexually violent person, the court shall order the person to be committed to the custody of the Department for control, care and treatment until such time as the person is no longer a sexually violent person.

(b)(1) The court shall enter an initial commitment order under this Section pursuant to a hearing held as soon as practicable after the judgment is entered that the person who is the subject of a petition under Section 15 is a sexually violent person. If the court lacks sufficient information to make the determination required by paragraph (b)(2) of this Section immediately after trial, it may adjourn the hearing and order the Department to conduct a predisposition investigation or a supplementary mental examination, or both, to assist the court in framing the commitment order. A supplementary mental examination under this Section shall be conducted in accordance with Section 3–804 of the Mental Health and Developmental Disabilities Code.[1]

(2) An order for commitment under this Section shall specify either institutional care in a secure facility, as provided under Section 60 of this Act, or conditional release. In determining whether commitment shall be for institutional care in a secure facility or for conditional release, the court shall consider the nature and circumstances of the behavior that was the basis of the allegation in the petition under paragraph (b)(1) of Section 15, the person's mental history and present mental condition, where the person will live, how the person will support himself or herself, and what arrangements are available to ensure that the person has access to and will participate in necessary treatment. All treatment, whether in institutional care, in a secure facility, or while on conditional release, shall be conducted in conformance with the standards developed under the Sex Offender Management Board Act and conducted by a treatment provider approved by the Board. The Department shall arrange for control, care and treatment of the person in the least restrictive manner consistent with the requirements of the person and in accordance with the court's commitment order.

(3) If the court finds that the person is appropriate for conditional release, the court shall notify the Department. The Department shall prepare a plan that identifies the treatment and services, if any, that the person will receive in the community. The plan shall address the person's need, if any, for supervision, counseling, medication, community support services, residential services, vocational services, and alcohol or other drug abuse treatment. The Department may contract with a county health department, with another public agency or with a private agency to provide the treatment and services identified in the plan. The plan shall specify who will be responsible for providing the treatment and services identified in the plan. The plan shall be presented to the court for its approval within 60 days after the court finding that the person is appropriate for conditional release, unless the Department and the person to be released request additional time to develop the plan. The conditional release program operated under this Section is not subject to the provisions of the Mental Health and Developmental Disabilities Confidentiality Act.[2]

(4) An order for conditional release places the person in the custody and control of the Department. A person on conditional release is subject to the conditions set by the court and to the rules of the Department. Before a person is placed on conditional release by the court under this Section, the court shall so notify the municipal police department and county sheriff for the municipality and county in which the person will be residing. The notification requirement under this Section does not apply if a municipal police department or county sheriff submits to the court a written statement waiving the right to be notified. If the Department alleges that a released person has violated any condition or rule, or that the safety of others requires that conditional release be revoked, he or she may be taken into custody under the rules of the Department.

At any time during which the person is on conditional release, if the Department determines that the person has violated any condition or rule, or that the safety of others requires that conditional release be revoked, the Department may request the Attorney General or State's Attorney to request the court to issue an emergency ex parte order directing any law enforcement officer to take the person into custody and transport the person to the county jail. The Department may request, or the Attorney General or State's Attorney may request independently of the Department, that a petition to revoke conditional release be filed. When a petition is filed, the court may order the Department to issue a notice to the person to be present at the Department or other agency designated by the court, order a summons to the person to be present, or order a body attachment for all law enforcement officers to take the person into custody and transport him or her to the county jail, hospital, or treatment facility. The Department shall submit a statement showing probable cause of the detention and a petition to revoke the order for conditional release to the committing court within 48 hours after the detention. The court shall hear the petition within 30 days, unless the hearing or time deadline is waived by the detained person. Pending the revocation hearing, the Department may detain the person in a jail, in a hospital or treatment facility. The State has the burden of proving by clear and convincing evidence that any rule or condition of release has been violated, or that the safety of others requires that conditional release be revoked. If the court determines after hearing that any rule or condition of release has been violated, or that the safety of

others requires that conditional release be revoked, it may revoke the order for conditional release and order that the released person be placed in an appropriate institution until the person is discharged from the commitment under Section 65 of this Act or until again placed on conditional release under Section 60 of this Act.

(5) An order for conditional release places the person in the custody, care, and control of the Department. The court shall order the person be subject to the following rules of conditional release, in addition to any other conditions ordered, and the person shall be given a certificate setting forth the conditions of conditional release. These conditions shall be that the person:

(A) not violate any criminal statute of any jurisdiction;

(B) report to or appear in person before such person or agency as directed by the court and the Department;

(C) refrain from possession of a firearm or other dangerous weapon;

(D) not leave the State without the consent of the court or, in circumstances in which the reason for the absence is of such an emergency nature, that prior consent by the court is not possible without the prior notification and approval of the Department;

(E) at the direction of the Department, notify third parties of the risks that may be occasioned by his or her criminal record or sexual offending history or characteristics, and permit the supervising officer or agent to make the notification requirement;

(F) attend and fully participate in assessment, treatment, and behavior monitoring including, but not limited to, medical, psychological or psychiatric treatment specific to sexual offending, drug addiction, or alcoholism, to the extent appropriate to the person based upon the recommendation and findings made in the Department evaluation or based upon any subsequent recommendations by the Department;

(G) waive confidentiality allowing the court and Department access to assessment or treatment results or both;

(H) work regularly at a Department approved occupation or pursue a course of study or vocational training and notify the Department within 72 hours of any change in employment, study, or training;

(I) not be employed or participate in any volunteer activity that involves contact with children, except under circumstances approved in advance and in writing by the Department officer;

(J) submit to the search of his or her person, residence, vehicle, or any personal or real property under his or her control at any time by the Department;

(K) financially support his or her dependents and provide the Department access to any requested financial information;

(L) serve a term of home confinement, the conditions of which shall be that the person:

(i) remain within the interior premises of the place designated for his or her confinement during the hours designated by the Department;

(ii) admit any person or agent designated by the Department into the offender's place of confinement at any time for purposes of verifying the person's compliance with the condition of his or her confinement;

(iii) if deemed necessary by the Department, be placed on an electronic monitoring device;

(M) comply with the terms and conditions of an order of protection issued by the court pursuant to the Illinois Domestic Violence Act of 1986.[3] A copy of the order of protection shall be transmitted to the Department by the clerk of the court;

(N) refrain from entering into a designated geographic area except upon terms the Department finds appropriate. The terms may include consideration of the purpose of the entry, the time of day, others accompanying the person, and advance approval by the Department;

(O) refrain from having any contact, including written or oral communications, directly or indirectly, with certain specified persons including, but not limited to, the victim or the victim's family, and report any incidental contact with the victim or the victim's family to the Department within 72 hours; refrain from entering onto the premises of, traveling past, or loitering near the victim's residence, place of employment, or other places frequented by the victim;

(P) refrain from having any contact, including written or oral communications, directly or indirectly, with particular types of persons, including but not limited to members of street gangs, drug users, drug dealers, or prostitutes;

(Q) refrain from all contact, direct or indirect, personally, by telephone, letter, or through another person, with minor children without prior identification and approval of the Department;

(R) refrain from having in his or her body the presence of alcohol or any illicit drug prohibited by the Cannabis Control Act,[4] the Illinois Controlled Substances Act,[5] or the Methamphetamine Control and Community Protection Act, unless prescribed by a physician, and submit samples of his or her breath, saliva, blood, or urine for tests to determine the presence of alcohol or any illicit drug;

(S) not establish a dating, intimate, or sexual relationship with a person without prior written notification to the Department;

(T) neither possess or have under his or her control any material that is pornographic, sexually oriented, or sexually stimulating, or that depicts or alludes to sexual activity or depicts minors under the age of 18, including but not limited to visual, auditory, telephonic, electronic media, or any matter obtained through access to any computer or material linked to computer access use;

(U) not patronize any business providing sexually stimulating or sexually oriented entertainment nor utilize "900" or adult telephone numbers or any other sex-related telephone numbers;

(V) not reside near, visit, or be in or about parks, schools, day care centers, swimming pools, beaches, theaters, or any other places where minor children congregate without advance approval of the Department and report any incidental contact with minor children to the Department within 72 hours;

(W) not establish any living arrangement or residence without prior approval of the Department;

(X) not publish any materials or print any advertisements without providing a copy of the proposed publications to the Department officer and obtaining permission prior to publication;

(Y) not leave the county except with prior permission of the Department and provide the Department officer

or agent with written travel routes to and from work and any other designated destinations;

(Z) not possess or have under his or her control certain specified items of contraband related to the incidence of sexually offending items including video or still camera items or children's toys;

(AA) provide a written daily log of activities as directed by the Department;

(BB) comply with all other special conditions that the Department may impose that restrict the person from high-risk situations and limit access or potential victims.

(6) A person placed on conditional release and who during the term undergoes mandatory drug or alcohol testing or is assigned to be placed on an approved electronic monitoring device may be ordered to pay all costs incidental to the mandatory drug or alcohol testing and all costs incidental to the approved electronic monitoring in accordance with the person's ability to pay those costs. The Department may establish reasonable fees for the cost of maintenance, testing, and incidental expenses related to the mandatory drug or alcohol testing and all costs incidental to approved electronic monitoring.

P.A. 90–40, § 40, eff. Jan. 1, 1998. Amended by P.A. 91–875, § 5, eff. June 30, 2000; P.A. 92–415, § 15, eff. Aug. 17, 2001; P.A. 93–616, § 20, eff. Jan. 1, 2004; P.A 94–556, § 1095, eff. Sept. 11, 2005.

1 405 ILCS 5/3–804.
2 740 ILCS 110/1 et seq.
3 750 ILCS 60/101 et seq.
4 720 ILCS 550/1 et seq.
5 720 ILCS 570/100 et seq.

## 207/45.  Deoxyribonucleic acid analysis requirements

§ 45.   Deoxyribonucleic acid analysis requirements.

(a)(1) If a person is found to be a sexually violent person under this Act, the court shall require the person to provide a biological specimen for deoxyribonucleic acid analysis in accordance with Section 5–4–3 of the Unified Code of Corrections.[1]

(2) The results from deoxyribonucleic acid analysis of a specimen under paragraph (a)(1) of this Section may be used only as authorized by Section 5–4–3 of the Unified Code of Corrections.

(b) The rules adopted by the Illinois Department of State Police under Section 5–4–3 of the Unified Code of Corrections are the procedures that must be followed for persons to provide specimens under paragraph (a)(1) of this Section.

P.A. 90–40, § 45, eff. Jan. 1, 1998. Amended by P.A. 91–227, § 5, eff. Jan. 1, 2000.

1 730 ILCS 5/5–4–3.

## 207/50.  Secure facility for sexually violent persons

§ 50.   Secure facility for sexually violent persons.

(a) The Department shall place a person committed to a secure facility under paragraph (b)(2) of Section 40 of this Act at a facility provided by the Department of Corrections under subsection (b) of this Section.

(b) The Department may enter into an agreement with the Department of Corrections for the provision of a secure facility for persons committed under paragraph (b)(2) of Section 40 of this Act to a facility.  The Department shall operate the facility provided by the Department of Corrections under this subsection and shall provide by rule for the

nature of the facility, the level of care to be provided in the facility, and the custody and discipline of persons placed in the facility.  The facility operated under this Section shall not be subject to the provisions of the Mental Health and Developmental Disabilities Code.[1]

(c) For the purposes of Section 3–6–4 of the Unified Code of Corrections,[2] a person held in detention in a secure facility or committed as a sexually violent person and held in a secure facility shall be considered a "committed person", as that term is used in Section 3–6–4 of the Unified Code of Corrections.

P.A. 90–40, § 50, eff. Jan. 1, 1998. Amended by P.A. 90–793, § 20, eff. Aug. 14, 1998.

1 405 ILCS 5/1–100 et seq.
2 730 ILCS 5/3–6–4.

## 207/55.  Periodic reexamination; report

§ 55.   Periodic reexamination; report.

(a) If a person has been committed under Section 40 of this Act and has not been discharged under Section 65 of this Act, the Department shall submit a written report to the court on his or her mental condition within 6 months after an initial commitment under Section 40 and then at least once every 12 months thereafter for the purpose of determining whether the person has made sufficient progress to be conditionally released or discharged.  At the time of a reexamination under this Section, the person who has been committed may retain or, if he or she is indigent and so requests, the court may, appoint a qualified expert or a professional person to examine him or her.

(b) Any examiner conducting an examination under this Section shall prepare a written report of the examination no later than 30 days after the date of the examination.  The examiner shall place a copy of the report in the person's health care records and shall provide a copy of the report to the court that committed the person under Section 40.  The examination shall be conducted in conformance with the standards developed under the Sex Offender Management Board and by an evaluator approved by the Board.

(c) Notwithstanding subsection (a) of this Section, the court that committed a person under Section 40 may order a reexamination of the person at any time during the period in which the person is subject to the commitment order.  Any examiner conducting an examination under this Section shall prepare a written report of the examination no later than 30 days after the date of the examination.

(d) Petitions for discharge after reexamination must follow the procedure outlined in Section 65 of this Act.

P.A. 90–40, § 55, eff. Jan. 1, 1998.  Amended by P.A. 90–793, § 20, eff. Aug. 14, 1998; P.A. 91–227, § 5, eff. Jan. 1, 2000; P.A. 91–875, § 5, eff. June 30, 2000; P.A. 93–616, § 20, eff. Jan. 1, 2004; P.A. 93–885, § 5, eff. Aug. 6, 2004.

P.A. 93–885 incorporated the amendment by P.A. 93–616.

## 207/60.  Petition for conditional release

§ 60.   Petition for conditional release.

(a) Any person who is committed for institutional care in a secure facility or other facility under Section 40 of this Act may petition the committing court to modify its order by authorizing conditional release if at least 6 months have elapsed since the initial commitment order was entered, the most recent release petition was denied or the most recent order for conditional release was revoked.  The director of the facility at which the person is placed may file a petition under this Section on the person's behalf at any time.

. (b) If the person files a timely petition without counsel, the court shall serve a copy of the petition on the Attorney General or State's Attorney, whichever is applicable and subject to paragraph (c)(1) of Section 15 of this Act, appoint counsel. If the person petitions through counsel, his or her attorney shall serve the Attorney General or State's Attorney, whichever is applicable.

(c) Within 20 days after receipt of the petition, the court shall appoint one or more examiners having the specialized knowledge determined by the court to be appropriate, who shall examine the mental condition of the person and furnish a written report of the examination to the court within 30 days after appointment. The examiners shall have reasonable access to the person for purposes of examination and to the person's past and present treatment records and patient health care records. If any such examiner believes that the person is appropriate for conditional release, the examiner shall report on the type of treatment and services that the person may need while in the community on conditional release. The State has the right to have the person evaluated by experts chosen by the State. Any examination or evaluation conducted under this Section shall be in conformance with the standards developed under the Sex Offender Management Board Act and conducted by an evaluator approved by the Board. The court shall set a probable cause hearing as soon as practical after the examiner's report is filed. If the court determines at the probable cause hearing that cause exists to believe that it is not substantially probable that the person will engage in acts of sexual violence if on release or conditional release, the court shall set a hearing on the issue.

(d) The court, without a jury, shall hear the petition within 30 days after the report of the court-appointed examiner is filed with the court, unless the petitioner waives this time limit. The court shall grant the petition unless the State proves by clear and convincing evidence that the person has not made sufficient progress to be conditionally released. In making a decision under this subsection, the court must consider the nature and circumstances of the behavior that was the basis of the allegation in the petition under paragraph (b)(1) of Section 15 of this Act, the person's mental history and present mental condition, where the person will live, how the person will support himself or herself and what arrangements are available to ensure that the person has access to and will participate in necessary treatment.

(e) Before the court may enter an order directing conditional release to a less restrictive alternative it must find the following: (1) the person will be treated by a Department approved treatment provider, (2) the treatment provider has presented a specific course of treatment and has agreed to assume responsibility for the treatment and will report progress to the Department on a regular basis, and will report violations immediately to the Department, consistent with treatment and supervision needs of the respondent, (3) housing exists that is sufficiently secure to protect the community, and the person or agency providing housing to the conditionally released person has agreed in writing to accept the person, to provide the level of security required by the court, and immediately to report to the Department if the person leaves the housing to which he or she has been assigned without authorization, (4) the person is willing to or has agreed to comply with the treatment provider, the Department, and the court, and (5) the person has agreed or is willing to agree to comply with the behavioral monitoring requirements imposed by the court and the Department.

(f) If the court finds that the person is appropriate for conditional release, the court shall notify the Department.

The Department shall prepare a plan that identifies the treatment and services, if any, that the person will receive in the community. The plan shall address the person's need, if any, for supervision, counseling, medication, community support services, residential services, vocational services, and alcohol or other drug abuse treatment. The Department may contract with a county health department, with another public agency or with a private agency to provide the treatment and services identified in the plan. The plan shall specify who will be responsible for providing the treatment and services identified in the plan. The plan shall be presented to the court for its approval within 60 days after the court finding that the person is appropriate for conditional release, unless the Department and the person to be released request additional time to develop the plan.

(g) The provisions of paragraphs (b)(4), (b)(5), and (b)(6) of Section 40 of this Act apply to an order for conditional release issued under this Section.

P.A. 90-40, § 60, eff. Jan. 1, 1998. Amended by P.A. 91-875, § 5, eff. June 30, 2000; P.A. 92-415, § 15, eff. Aug. 17, 2001; P.A. 93-616, § 20, eff. Jan. 1, 2004; P.A. 93-885, § 5, eff. Aug. 6, 2004.

P.A. 93-885 incorporated the amendment by P.A. 93-616.

## 207/65.  Petition for discharge; procedure

§ 65.  Petition for discharge; procedure.

(a)(1) If the Secretary determines at any time that a person committed under this Act is no longer a sexually violent person, the Secretary shall authorize the person to petition the committing court for discharge. The person shall file the petition with the court and serve a copy upon the Attorney General or the State's Attorney's office that filed the petition under subsection (a) of Section 15 of this Act, whichever is applicable. The court, upon receipt of the petition for discharge, shall order a hearing to be held within 45 days after the date of receipt of the petition.

(2) At a hearing under this subsection, the Attorney General or State's Attorney, whichever filed the original petition, shall represent the State and shall have the right to have the petitioner examined by an expert or professional person of his or her choice. The examination shall be conducted in conformance with the standards developed under the Sex Offender Management Act and by an evaluator approved by the Board. The committed person or the State may elect to have the hearing before a jury. The State has the burden of proving by clear and convincing evidence that the petitioner is still a sexually violent person.

(3) If the court or jury is satisfied that the State has not met its burden of proof under paragraph (a)(2) of this Section, the petitioner shall be discharged from the custody or supervision of the Department. If the court is satisfied that the State has met its burden of proof under paragraph (a)(2), the court may proceed under Section 40 of this Act to determine whether to modify the petitioner's existing commitment order.

(b)(1) A person may petition the committing court for discharge from custody or supervision without the Secretary's approval. At the time of an examination under subsection (a) of Section 55 of this Act, the Secretary shall provide the committed person with a written notice of the person's right to petition the court for discharge over the Secretary's objection. The notice shall contain a waiver of rights. The Secretary shall forward the notice and waiver form to the court with the report of the Department's examination under Section 55 of this Act. If the person does not affirmatively waive the right to petition, the court shall

set a probable cause hearing to determine whether facts exist that warrant a hearing on whether the person is still a sexually violent person. If a person does not file a petition for discharge, yet fails to waive the right to petition under this Section, then the probable cause hearing consists only of a review of the reexamination reports and arguments on behalf of the parties. The committed person has a right to have an attorney represent him or her at the probable cause hearing but the person is not entitled to be present at the probable cause hearing. The probable cause hearing under this Section may be held within 45 days of the filing of the reexamination report under Section 55 of this Act.

(2) If the court determines at the probable cause hearing under paragraph (b)(1) of this Section that probable cause exists to believe that the committed person is no longer a sexually violent person, then the court shall set a hearing on the issue. At a hearing under this Section, the committed person is entitled to be present and to the benefit of the protections afforded to the person under Section 25 of this Act. The committed person or the State may elect to have a hearing under this Section before a jury. A verdict of a jury under this Section is not valid unless it is unanimous. The Attorney General or State's Attorney, whichever filed the original petition, shall represent the State at a hearing under this Section. The State has the right to have the committed person evaluated by experts chosen by the State. The examination shall be conducted in conformance with the standards developed under the Sex Offender Management Board Act and by an evaluator approved by the Board. At the hearing, the State has the burden of proving by clear and convincing evidence that the committed person is still a sexually violent person.

(3) If the court or jury is satisfied that the State has not met its burden of proof under paragraph (b)(2) of this Section, the person shall be discharged from the custody or supervision of the Department. If the court or jury is satisfied that the State has met its burden of proof under paragraph (b)(2) of this Section, the court may proceed under Section 40 of this Act to determine whether to modify the person's existing commitment order.
P.A. 90–40, § 65, eff. Jan. 1, 1998. Amended by P.A. 91–227, § 5, eff. Jan. 1, 2000; P.A. 92–415, § 15, eff. Aug. 17, 2001; P.A. 93–616, § 20, eff. Jan. 1, 2004.

Validity

*Subsection (b)(1) was held unconstitutional by People v. Botruff, App. 2 Dist.2002, 265 Ill.Dec. 866, 831 Ill.App.3d 486, 771 N.E.2d 570, appeal allowed 271 Ill.Dec. 980, 201 Ill.2d 579, 786 N.E.2d 188.*

## 207/70. Additional discharge petitions

§ 70. Additional discharge petitions. In addition to the procedures under Section 65 of this Act, a committed person may petition the committing court for discharge at any time, and the court must set the matter for a probable cause hearing; however, if a person has previously filed a petition for discharge without the Secretary's approval and the court determined, either upon review of the petition or following a hearing, that the person's petition was frivolous or that the person was still a sexually violent person, then the court shall deny any subsequent petition under this Section without a hearing unless the petition contains facts upon which a court could find that the condition of the person had so changed that a hearing was warranted. If the court finds that a hearing is warranted, the court shall set a probable cause hearing and continue proceedings under paragraph (b)(2) of Section 65, if appropriate. If the person has not previously

filed a petition for discharge without the Secretary's approval, the court shall set a probable cause hearing and continue proceedings under paragraph (b)(2) of Section 65, if appropriate.
P.A. 90–40, § 70, eff. Jan. 1, 1998. Amended by P.A. 91–227, § 5, eff. Jan. 1, 2000.

## 207/75. Notice concerning conditional release, discharge, escape, death, or court-ordered change in the custody status of a detainee or civilly committed sexually violent person

*Text of section effective until June 1, 2006*

§ 75. Notice concerning conditional release, discharge, escape, death, or court-ordered change in the custody status of a detainee or civilly committed sexually violent person.

(a) As used in this Section, the term:

(1) "Act of sexual violence" means an act or attempted act that is a basis for an allegation made in a petition under paragraph (b) (1) of Section 15 of this Act.

(2) "Member of the family" means spouse, child, sibling, parent, or legal guardian.

(3) "Victim" means a person against whom an act of sexual violence has been committed.

(b) If the court places a civilly committed sexually violent person on conditional release under Section 40 or 60 of this Act or discharges a person under Section 65, or if a detainee or civilly committed sexually violent person escapes, dies, or is subject to any court-ordered change in custody status of the detainee or sexually violent person, the Department shall make a reasonable attempt, if he or she can be found, to notify all of the following who have requested notification under this Act or under the Rights of Crime Victims and Witnesses Act: [1]

(1) Whichever of the following persons is appropriate in accordance with the provisions of subsection (a)(3):

(A) The victim of the act of sexual violence.

(B) An adult member of the victim's family, if the victim died as a result of the act of sexual violence.

(C) The victim's parent or legal guardian, if the victim is younger than 18 years old.

(2) The Department of Corrections.

(c) The notice under subsection (b) of this Section shall inform the Department of Corrections and the person notified under paragraph (b)(1) of this Section of the name of the person committed under this Act and the date the person is placed on conditional release, discharged, or if a detainee or civilly committed sexually violent person escapes, dies, or is subject to any court-ordered change in the custody status of the detainee or sexually violent person. The Department shall send the notice, postmarked at least 7 days before the date the person committed under this Act is placed on conditional release, discharged, or if a detainee or civilly committed sexually violent person escapes, dies, or is subject to any court-ordered change in the custody status of the detainee or sexually violent person, unless unusual circumstances do not permit advance written notification, to the Department of Corrections and the last-known address of the person notified under paragraph (b)(1) of this Section.

(d) The Department shall design and prepare cards for persons specified in paragraph (b)(1) of this Section to send to the Department. The cards shall have space for these persons to provide their names and addresses, the name of

the person committed under this Act and any other information the Department determines is necessary. The Department shall provide the cards, without charge, to the Attorney General and State's Attorneys. The Attorney General and State's Attorneys shall provide the cards, without charge, to persons specified in paragraph (b)(1) of this Section. These persons may send completed cards to the Department. All records or portions of records of the Department that relate to mailing addresses of these persons are not subject to inspection or copying under Section 3 of the Freedom of Information Act.[2]

P.A. 90-40, § 75, eff. Jan. 1, 1998. Amended by P.A. 90-793, § 20, eff. Aug. 14, 1998; P.A. 93-885, § 5, eff. Aug. 6, 2004.

   [1] 725 ILCS 120/1 et seq.

   [2] 5 ILCS 140/1 et seq.

*For text of section effective June 1, 2006,*
*see 725 ILCS 207/75, post*

### 207/75. Notice concerning conditional release, discharge, escape, death, or court-ordered change in the custody status of a detainee or civilly committed sexually violent person

*Text of section effective June 1, 2006*

§ 75. Notice concerning conditional release, discharge, escape, death, or court-ordered change in the custody status of a detainee or civilly committed sexually violent person.

(a) As used in this Section, the term:

(1) "Act of sexual violence" means an act or attempted act that is a basis for an allegation made in a petition under paragraph (b) (1) of Section 15 of this Act.

(2) "Member of the family" means spouse, child, sibling, parent, or legal guardian.

(3) "Victim" means a person against whom an act of sexual violence has been committed.

(b) If the court places a civilly committed sexually violent person on conditional release under Section 40 or 60 of this Act or discharges a person under Section 65, or if a detainee or civilly committed sexually violent person escapes, dies, or is subject to any court-ordered change in custody status of the detainee or sexually violent person, the Department shall make a reasonable attempt, if he or she can be found, to notify all of the following who have requested notification under this Act or under the Rights of Crime Victims and Witnesses Act:[1]

(1) Whichever of the following persons is appropriate in accordance with the provisions of subsection (a)(3):

(A) The victim of the act of sexual violence.

(B) An adult member of the victim's family, if the victim died as a result of the act of sexual violence.

(C) The victim's parent or legal guardian, if the victim is younger than 18 years old.

(2) The Department of Corrections or the Department of Juvenile Justice.

(c) The notice under subsection (b) of this Section shall inform the Department of Corrections or the Department of Juvenile Justice and the person notified under paragraph (b)(1) of this Section of the name of the person committed under this Act and the date the person is placed on conditional release, discharged, or if a detainee or civilly committed sexually violent person escapes, dies, or is subject to any court-ordered change in the custody status of the detainee or

sexually violent person. The Department shall send the notice, postmarked at least 7 days before the date the person committed under this Act is placed on conditional release, discharged, or if a detainee or civilly committed sexually violent person escapes, dies, or is subject to any court-ordered change in the custody status of the detainee or sexually violent person, unless unusual circumstances do not permit advance written notification, to the Department of Corrections or the Department of Juvenile Justice and the last-known address of the person notified under paragraph (b)(1) of this Section.

(d) The Department shall design and prepare cards for persons specified in paragraph (b)(1) of this Section to send to the Department. The cards shall have space for these persons to provide their names and addresses, the name of the person committed under this Act and any other information the Department determines is necessary. The Department shall provide the cards, without charge, to the Attorney General and State's Attorneys. The Attorney General and State's Attorneys shall provide the cards, without charge, to persons specified in paragraph (b)(1) of this Section. These persons may send completed cards to the Department. All records or portions of records of the Department that relate to mailing addresses of these persons are not subject to inspection or copying under Section 3 of the Freedom of Information Act.[2]

P.A. 90-40, § 75, eff. Jan. 1, 1998. Amended by P.A. 90-793, § 20, eff. Aug. 14, 1998; P.A. 93-885, § 5, eff. Aug. 6, 2004; P.A. 94-696, § 22, eff. June 1, 2006.

   [1] 725 ILCS 120/1 et seq.

   [2] 5 ILCS 140/1 et seq.

*For text of section effective until June 1,*
*2006, see 725 ILCS 207/75, ante*

### 207/80. Applicability

§ 80. Applicability. This Act applies to a sexually violent person regardless of whether the person engaged in acts of sexual violence before, on, or after the effective date of this Act.

P.A. 90-40, § 80, eff. Jan. 1, 1998.

### 207/90. Committed persons ability to pay for services

§ 90. Committed persons ability to pay for services. Each person committed or detained under this Act who receives services provided directly or funded by the Department and the estate of that person is liable for the payment of sums representing charges for services to the person at a rate to be determined by the Department. Services charges against that person take effect on the date of admission or the effective date of this Section. The Department in its rules may establish a maximum rate for the cost of services. In the case of any person who has received residential services from the Department, whether directly from the Department or through a public or private agency or entity funded by the Department, the liability shall be the same regardless of the source of services. When the person is placed in a facility outside the Department, the facility shall collect reimbursement from the person. The Department may supplement the contribution of the person to private facilities after all other sources of income have been utilized; however the supplement shall not exceed the allowable rate under Title XVIII or Title XIX of the Federal Social Security Act[1] for those persons eligible for those respective programs. The Department may pay the actual costs of services or maintenance in the facility and may

collect reimbursement for the entire amount paid from the person or an amount not to exceed the maximum. Lesser or greater amounts may be accepted by the Department when conditions warrant that action or when offered by persons not liable under this Act. Nothing in this Section shall preclude the Department from applying federal benefits that are specifically provided for the care and treatment of a disabled person toward the cost of care provided by a State facility or private agency. The Department may investigate the financial condition of each person committed under this Act, may make determinations of the ability of each such person to pay sums representing services charges, and for those purposes may set a standard as a basis of judgment of ability to pay. The Department shall by rule make provisions for unusual and exceptional circumstances in the application of that standard. The Department may issue to any person liable under this Act a statement of amount due as treatment charges requiring him or her to pay monthly, quarterly, or otherwise as may be arranged, an amount not exceeding that required under this Act, plus fees to which the Department may be entitled under this Act.

(a) Whenever an individual is covered, in part or in whole, under any type of insurance arrangement, private or public, for services provided by the Department, the proceeds from the insurance shall be considered as part of the individual's ability to pay notwithstanding that the insurance contract was entered into by a person other than the individual or that the premiums for the insurance were paid for by a person other than the individual. Remittances from intermediary agencies under Title XVIII of the Federal Social Security Act for services to committed persons shall be deposited with the State Treasurer and placed in the Mental Health Fund. Payments received from the Department of Public Aid under Title XIX of the Federal Social Security Act for services to those persons shall be deposited with the State Treasurer and shall be placed in the General Revenue Fund.

(b) Any person who has been issued a Notice of Determination of sums due as services charges may petition the Department for a review of that determination. The petition must be in writing and filed with the Department within 90 days from the date of the Notice of Determination. The Department shall provide for a hearing to be held on the charges for the period covered by the petition. The Department may after the hearing, cancel, modify, or increase the former determination to an amount not to exceed the maximum provided for the person by this Act. The Department at its expense shall take testimony and preserve a record of all proceedings at the hearing upon any petition for a release from or modification of the determination. The petition and other documents in the nature of pleadings and motions filed in the case, a transcript of testimony, findings of the Department, and orders of the Secretary constitute the record. The Secretary shall furnish a transcript of the record to any person upon payment of 75¢ per page for each original transcript and 25¢ per page for each copy of the transcript. Any person aggrieved by the decision of the Department upon a hearing may, within 30 days thereafter, file a petition with the Department for review of the decision by the Board of Reimbursement Appeals established in the Mental Health and Developmental Disabilities Code.[2] The Board of Reimbursement Appeals may approve action taken by the Department or may remand the case to the Secretary with recommendation for redetermination of charges.

(c) Upon receiving a petition for review under subsection (b) of this Section, the Department shall thereupon notify the Board of Reimbursement Appeals which shall render its decision thereon within 30 days after the petition is filed and certify such decision to the Department. Concurrence of a majority of the Board is necessary in any such decision. Upon request of the Department, the State's Attorney of the county in which a client who is liable under this Act for payment of sums representing services charges resides, shall institute appropriate legal action against any such client, or within the time provided by law shall file a claim against the estate of the client who fails or refuses to pay these charges. The court shall order the payment of sums due for services charges for such period or periods of time as the circumstances require. The order may be entered against any defendant and may be based upon the proportionate ability of each defendant to contribute to the payment of sums representing services charges including the actual charges for services in facilities outside the Department where the Department has paid those charges. Orders for the payment of money may be enforced by attachment as for contempt against the persons of the defendants and, in addition, as other judgments for the payment of money, and costs may be adjudged against the defendants and apportioned among them.

(d) The money collected shall be deposited into the Mental Health Fund.

P.A. 90–40, § 90, added by P.A. 90–793, § 20, eff. Aug. 14, 1998.

  [1] 42 U.S.C.A. §§ 1395 et seq. or 1396 et seq.
  [2] 405 ILCS 5/1–100 et seq.

## 207/99.  Effective date

§ 99.  Effective date. This Act takes effect January 1, 1998.

P.A. 90–40, § 99, eff. Jan. 1, 1998.

## ACT 210.  STATE'S ATTORNEYS APPELLATE PROSECUTOR'S ACT

Section
210/1.    Short title.
210/2.    Definitions.
210/3.    Creation; membership; term; election; quorum; compensation; vacancies.
210/4.    Powers and duties.
210/4.01. Cases represented on appeal; duties under controlled substances statutes; forfeiture statute; Public Labor Relations Act; tax objections.
210/4.02. Appointment of Director.
210/4.03. Advise the Director; operation of office.
210/4.04. Establishment of district offices.
210/4.05. Approval of budget; number of employees.
210/4.06. Annual report.
210/4.07. Acceptance and expenditure of gifts and service contracts.
210/4.08. Law students as legal assistants and interns.
210/4.09. Administration of Act.
210/4.10. Training programs; dissemination of current case and legislative information; continuing legal education trust fund.
210/5.    Oath of office.
210/6.    Organization.
210/7.    Powers and duties of Director.
210/7.01. Appointment of Director.
210/7.02. Hiring of employees; compensation; limitations.
210/7.03. Organization of office and duties of employees.
210/7.04. Reports.

This Equal protection Clause" Actually guarantees that the government will Not Classify individuals on the basis of impermissible criteria. "see" IN Re Alien Children Litigation, 457 U.S. 202, 102, S.Ct 2382, 2394, 72 L.3d.2d.786 (1982)

Therefore, "whenever the government treats any person unequally based on An impermissible Criteria, that person has Suffered an INJury that falls Squarely within the language and Spirit of the Constitution's guarantee's of equal protection. "see" Adarand Constructor V class PeNA, 515 U.S. 200, 115 S.Ct. 2097, 2114, 132 L.3d.2d

That it is the A policy and practice, Sponsered privately by the ~~Attorney General office~~ to denied All S.V.P. their due process Rights.

IN that IN every case the Attorney General wait until the last minute to file State Petiti. for Commitment; even tho they know well befo the 90 day before release what they are going to do; this is IN violation of the Right: reasonably Notice of hearing was Not given, the Accusal was Not Advised by the Committing Judge of his Right to make A reply and to produc witness, Nor was he Afforded any oppourtunity t produce evidence IN his own behalf, these are Constitutionally required procedural Safeguard

IN that IN every CASE upon Serving of Petition the detainee's is placed IN ISOLATION Segragation by the State Actor IDOC, And this is A policy and practice that is Sponsered privately by the Attorney General office.

IN Violation of U.S. Const. Amend 5, 6, 14. Due process And in liberty interest Right And Equal protection Right. IN Violation of Reasonable Notice.

If Not for the direct Action take by the Attorney General office IN Notice And IN the filing of A 11th hour petition IN every CASE.

There fore it was the direct Action by the State; that denied the required due process And Equal protection Rights to the Respondent in liberty interest Rights by the delibrate Actions of the Attorney General office IN practice And IN policy to restrict, INterfer with, And to deny the due process And Equal protection And the liberty interest Rights of the Respondent and All other S.V.P.

(I)

(1) That the Illinios S.V.P. Commitment Act (725 ILS²⁰⁷)
Violates the U.S. Const. amend 4, 5, 6, 14th in that this
Action by the State is directly punitive And
Violative of Respondent's liberty interest rights
(Statutes) in due process And equal protection under the law.
  950. "In the Constitutionality of State Stautes" And §90
(1) A deprivation of a constitutionally protected
liberty or property And (2) A denial of Adequate
procedural protections. (See) Hufford v mc Enaney,
2001 WL 536847 * 9 (9th cir 2001) (quoting Brewster v
Bd. of Ed., 149 F.3d 971, 982 (9th cir 1998) Law which
Are discriminatory, unreasonable, unfair, or which
unnecessarily interfere with personal freedoms
Are prohibited by the due process clause. Due process
Also requires that procedures used by the government
in enforcing the law meet certain basic Standard
of fairness.

(2) That the U.S. Supreme court decision in Kansas
v hendricks. 521 U.S. 346, 117 S.ct. 2072, (1997)
held that A Kansas Sexual offender Commitment
Statute did Not violate double Jeopardy. The Court
held the Kansas Statute to be civil, And Not Criminal
And the ensuing commitment was Not double Jeopardy
  However, the Illinios S.V.P. Act differ from the
Kansas Statute in A Number of respects.

⑦

(3)  That IN KANSAS V Hendrick, Justice Kennedy wrote " we Should bear IN mind that while IN capacitation is A goal Common to both Criminal And Civil Systems of Confinement, Retribution And General deterrence Are reserved for the Criminal System Alone

on the record before us the Kansas civil Statute Conform to our precedents. If however, civil Confinement were to become A mechanism for retribution or general deterrence ... our precedents would Not Suffice to validate it

Thus Justice KENNedy is making it clear that his Concurrence, And therefore the 5-4 majority decision IN Kansas V Hendrick is dependent on the Statutes being truly civil IN Nature.

He make it clear that he is ruling on the Record before him, And Not Condoning A broad Acceptance of Sex offender Commitment law. The Illinois S.V.P Act violate Justice Kennedy exact Concern:

(4)  That it is well Settled that the label "Civil or Criminal" is Not dispositive As to the Actual legal designation of A Statutes. The Supreme Court IN U.S. V Ursery 518 U.S ___ Set out the following test/inquiry As to whether A Statute is civil or Criminal: whether A Statutory Scheme is punitive (either in purpose or effect) to Negate the legislature intention to establish a civil remedial mechanism (emphasis Add)

③

(5) That the Illinios S.V.P. Act requires that the person Against whom the State is Seeking Commitment have A criminal Conviction for A Sex offense, And Serve All of his prison Sentence, before the Act be Applied to that person. Neither the Civil Commitment Statutes in <u>Kansas v hendrick</u> or Allen v Illinios 478 U.S. 364, 106 SCt 2988, : Require An underlying Criminal Conviction as A prerequisite for Commitment.

There is NO reason to tie A civil Commitment Statute to A criminal Conviction. INfact, the only reason is to <u>INflict further punishment.</u>

Whether A person has A criminal Conviction in his or her past has little to do with the person <u>current mental Condition</u> : A Petition filed under the Illinios S.V.P. Act And the prerequisite to A criminal Conviction are so INternally interturned, IN Contrast, the Kansas <u>Statute IN Hendrick</u> Require No Criminal Conviction "or" Sentence to trigger its provisions" The Kansas Statute is directly related to <u>the person current mental Condition</u>

(6) futher, the Illinios S.V.P. Commitment Act, As, opposed to the Kansas Statute IN <u>Hendrick</u> require that the commitment begin After the person has Served his or her Sentence.

This precludes Any chance of the person being Identified and treated during the period of his INCARCERATION from the Sentence given for the Crime

④

If the Aim was to treat the person, it would make more Sense to begin the process of Identifing and treating his Condition As early As possible.

The proof that the S.V.P. Act is punitive And unconstitutional we need to Just Look At 730 ILCS-5/3 8-5 ( Tranfer to Department of Human Service Ad which State:

The Department Shall cause INquiry and examination at periodic interval to Ascertain whether any person Committed to it may be SubJect to INvoluntary Admission, As defined IN (Section 1-119 of the mental health And developementa Disabilities Code ²) or meet the Standard for Judicial Admission As defined IN Section 4-500 of the mental Health And Developement Disabilities Code², or IS An Addict, Alcoholic or INtoxicated person As defined in the Alcoholism And other Drug Abuse And dependency Act³.

The department may provide Special psychiatric or psychological or other Counseling or treatment to Such person IN A Seperate INsitution with IN the department or the Director of the department of Correction may tranfer Such person other than Addicts or Alcoholics or INtoxicated person to the D.H.S. for observation, diagnosis And treatment, SubJect to the Approval of the director of D.H.S. for a period of not more than 6 months, If the person consents, and if he does Not Consent, Such tranfer may be effected only by Commitment under paragraph (c) and (d)

Formerly Ill.Rev.Stat.1991, ch. 38, ¶ 1003–8–1.

## 5/3–8–2.  Social Evaluation

§ 3–8–2.  Social Evaluation. (a) A social evaluation shall be made of a committed person's medical, psychological, educational and vocational condition and history, including the use of alcohol and other drugs, the circumstances of his offense, and such other information as the Department may determine. The committed person shall be assigned to an institution or facility in so far as practicable in accordance with the social evaluation. Recommendations shall be made for medical, dental, psychiatric, psychological and social service treatment.

(b) A record of the social evaluation shall be entered in the committed person's master record file and shall be forwarded to the institution or facility to which the person is assigned.

(c) Upon admission to a correctional institution each committed person shall be given a physical examination. If he is suspected of having a communicable disease that in the judgment of the Department medical personnel requires medical isolation, the committed person shall remain in medical isolation until it is no longer deemed medically necessary. P.A. 77–2097, § 3–8–2, eff. Jan. 1, 1973. Amended by P.A. 84–1475, § 3, eff. Feb. 5, 1987; P.A. 87–1256, § 3, eff. July 1, 1993.

Formerly Ill.Rev.Stat.1991, ch. 38, ¶ 1003–8–2.

## 5/3–8–3.  Program Assignments

§ 3–8–3.  Program Assignments. (a) Work, education and other program assignments shall be made in so far as practicable in accordance with the social evaluation.

(b) The Director shall establish procedures for making and reviewing program assignments. P.A. 77–2097, § 3–8–3, eff. Jan. 1, 1973.

Formerly Ill.Rev.Stat.1991, ch. 38, ¶ 1003–8–3.

## 5/3–8–4.  Intradivisional Transfers

§ 3–8–4.  Intradivisional Transfers. (a) After the initial assignments under Sections 3–8–2 and 3–8–3, all transfers of committed persons to another institution or facility shall be reviewed and approved by a person or persons designated by the Director. A record of each transfer and the reasons therefor shall be included in the person's master record file.

(b) Transfers to facilities for psychiatric treatment and care within the Department shall be made only after prior psychiatric examination and certification to the Director that such transfer is required. Persons in facilities for psychiatric treatment and care within the Department shall be reexamined at least every 6 months. Persons found to no longer require psychiatric treatment and care shall be transferred to other facilities of the Department. P.A. 77–2097, § 3–8–4, eff. Jan. 1, 1973.

Formerly Ill.Rev.Stat.1991, ch. 38, ¶ 1003–8–4.

## 5/3–8–5.  Transfer to Department of Human Services

§ 3–8–5.  Transfer to Department of Human Services.

(a) The Department shall cause inquiry and examination at periodic intervals to ascertain whether any person committed to it may be subject to involuntary admission, as defined in Section 1–119 of the Mental Health and Developmental Disabilities Code,[1] or meets the standard for judicial admission as defined in Section 4–500 of the Mental Health and Developmental Disabilities Code,[2] or is an addict, alcoholic or

intoxicated person as defined in the Alcoholism and Other Drug Abuse and Dependency Act.[3] The Department may provide special psychiatric or psychological or other counseling or treatment to such persons in a separate institution within the Department, or the Director of the Department of Corrections may transfer such persons other than addicts, alcoholics or intoxicated persons to the Department of Human Services for observation, diagnosis and treatment, subject to the approval of the Director of the Department of Human Services, for a period of not more than 6 months, if the person consents in writing to the transfer. The person shall be advised of his right not to consent, and if he does not consent, such transfer may be effected only by commitment under paragraphs (c) and (d) of this Section.

(b) The person's spouse, guardian or nearest relative and his attorney of record shall be advised of their right to object, and if objection is made, such transfer may be effected only by commitment under paragraph (c) of this Section. Notices of such transfer shall be mailed to such person's spouse, guardian or nearest relative and to the attorney of record marked for delivery to addressee only at his last known address by certified mail with return receipt requested together with written notification of the manner and time within which he may object thereto.

(c) If a committed person does not consent to his transfer to the Department of Human Services or if a person objects under paragraph (b) of this Section, or if the Department of Human Services determines that a transferred person requires commitment to the Department of Human Services for more than 6 months, or if the person's sentence will expire within 6 months, the Director of the Department of Corrections shall file a petition in the circuit court of the county in which the correctional institution or facility is located requesting the transfer of such person to the Department of Human Services. A certificate of a psychiatrist, clinical psychologist or, if admission to a developmental disability facility is sought, of a physician that the person is in need of commitment to the Department of Human Services for treatment or habilitation shall be attached to the petition. Copies of the petition shall be furnished to the named person and to the state's attorneys of the county in which the correctional institution or facility is located and the county in which the named person was committed to the Department of Corrections.

(d) The court shall set a date for a hearing on the petition within the time limit set forth in the Mental Health and Developmental Disabilities Code.[4] The hearing shall be conducted in the manner prescribed by the Mental Health and Developmental Disabilities Code. If the person is found to be in need of commitment to the Department of Human Services for treatment or habilitation, the court may commit him to that Department.

(e) Nothing in this Section shall limit the right of the Director or the chief administrative officer of any institution or facility to utilize the emergency admission provisions of the Mental Health and Developmental Disabilities Code with respect to any person in his custody or care. The transfer of a person to an institution or facility of the Department of Human Services under paragraph (a) of this Section does not discharge the person from the control of the Department. P.A. 77–2097, § 3–8–5, eff. Jan. 1, 1973. Amended by P.A. 77–2827, § 1, eff. Jan. 1, 1973; P.A. 78–255, § 61, eff. Oct. 1, 1973; P.A. 78–939, § 1, eff. July 1, 1974; P.A. 78–992, § 12, eff. Oct. 1, 1974; P.A. 78–1297, § 58, eff. March 4, 1975; P.A. 81–337, § 5, eff. Aug. 31, 1979; P.A. 83–969, Art. VI, § 61, eff. July 1, 1984; P.A. 85–965, Art. XII, § 3, eff. July 1, 1988;

P.A. 86–1403, § 2 ... 86, eff. Dec. 2, 19 ... 1, 1997.

Formerly Ill.Rev ... 1 405 ILCS 5/1–1 ... 2 405 ILCS 5/4–5 ... 3 20 ILCS 301/1– ... 4 405 ILCS 5/1–1

## 5/3–8–6.  Retu ... Hu ...

§ 3–8–6.  Ret ... man Services.

(a) The Depar ... Department of C ... Section 3–8–5, w ... Department of H ... involuntary adm ... judicial admissio

(b) If a perso ... under paragraph ... has not had a pa ... he shall have a ... return.

(c) The Depar ... tary of Human S ... any person tran ... vices under Sec ... Services determ ... paragraph (a) o ... tion, it shall fil ... admission of su ... Developmental I

(d) The Depa ... der the Mental ... any person tran ... 3–8–5, whose se ... whom the Depa ... subject to invol ... standard for jud ... P.A. 77–2097, § ... 992, § 12, ef ... 79; P.A. 83–9 ... 7, Art. 90, § ... Formerly Ill.Re ... 1 405 ILCS 5/1– ...

## 3–8–7.  Disc ...

§ 3–8–7.  Dis ... tion shall be c ... and conduct ... plinary pro ... shall be a ... (1) Corpor ... medical o ... rials are p ... (Blank). ... (Blank). ... Review of ... shall be pr ... Section 3 ... person w ... tely man

⑤

However, the Aim of the Illinias Statute (S.V.P.) is to keep the person INCARCERATED for as long as possible, that is why they do not for Identifiction or treatment under "730 ILCS 5/3 8-5 of this Act begin treatment as soon as they come into I.D.O.C.; but waited until after the person prison Sentence "end" This Act S.V.P. can only be for further INCARCERATION, therefore unconstitutional under <u>Kansas v Hendrick</u>.

This Act 730 ILCS 5/3 8-5 has been in effect Since Jan 1, 1973: that is 34 years and therefore their was no need for S.V.P. Act: They need only enforce the 730 ILCS 5/3 8-5: therefore in violation of due process clause and equal protection clause of the Constitution

(7) That Illinias Already has a Statute that provide for Civil Commitment (and treatment) of Sex offenders, and does not require that the person first Serve a Doc Sentence. (The act is the Sexuall Dangerous Person Act 725 ILCS 205) this make the State to elect between Commitment and or prosecution) (between civil or Criminal provision thus avoiding any double Jeopardy problem.

If Illinios Already has two Statute whose purpose And aim is to keep and treatment those with menta Illness: S.D.P. (725 ILCS 205) and those who are Already in I.D.O.C. (traafer to D.H.S. Act 730 ILCS 5/3 8-5 Then why enact a Statutes that does the Samething only waited until the person has completed a

⑥

D.O.C. Sentence? The only reasonable answer is to further punish the person to, in effect, to lengthen their prison Sentence, or to give the person a probable life Sentence and without the niceties of a crime, a proof beyound a reasonable doubt and a Judge to determine a proper Sentence for that New crime based on Constitutional Requirement,

As Justice Kennedy wrote in hendrick: If the treatment provision were adopted as A Sham or mere pretext, there would have been an Indication of the forbidden purpose to punish.

(8) That Section 207/50 (a) of the S.V.P Act requires that the person Detained or Committed be placed "at a facility provided by the D.O.C. ... This provision further Support the Conclusion that punishment, and Not treatment, is the purpose of Illinios S.V.P. Statute:

The person must be placed in a D.O.C. provided facility, and Not one of the other numerous Department of human Services facility that other people found to be Subject to Commitment are placed.

If treatment was the true purpose, then the detainee or Committed person would be placed in the facility best Suited to Rehabilitate him.

The Illinios Act doesn't even try or Attempt to gauge the level of Security or treatment each Individual Needs. and Scheme that treat and Classifies all Sex offender the Same, and does

⑦

Not take Individual Characteristic into Account is not geared toward treating and rehabilitating those Individuals.

(9) The place of Confinement is an important distinction between the Kansas Statute upheld in <u>Hendrick</u>, and the Illinios Act under Consideration here.

One of the factor Specifically Addressed by the Court in finding the Kansas Commitment Scheme: (A)n Individual Confined under the Act is not Subject to the more restrictive Condition placed on prisoner but Instead experiences the Same Condition As Any Involuntarily Committed patient in the State mental institution Hendrich, 138 L.3d. 2d At 516.

(10) That to further Compound this issue, Section 207/50(b) of the Illinios S.V.P Act provide that the D.O.C. facility used to Confine Alleged And Committed or detained S.V.P. ( is not to be Subjected to the provision of the mental Health And Development Disabilities Code )(Emphasis Added)

This is Another important distinction between the Illinios Act, And, Any other Sex offender Statute In the Country (U.SA.) If treatment is the true purpose, what good reason is there to exempt the "<u>treatment facility</u>" from the provision of the mental Health And Developmental Disabilities Code?

㉚

The whole purpose of the <u>mental Health Code</u> is to Assure that A person detained or Committed for mental health reason <u>are Not treated like prisoner</u>: The Code Assure that among other thing:

(A) That treatment is held to A certain standard:

(b) That treatment personal meet certain minmen requirement:

(c) That person are treated in the least restrictive enviroment.

(d) That the use of Restraints and lockdown ( Seclusion) are only used to treatment, and Not punitive purpose, and that their use is limited in duration.

(E) That person detain or Committed recieve unipeded private And uncensored mail, telephone, and visits

(f) That detain or Committed person are Able to receive and possess personal property.

(g) That detainee or Committed person are Able to use money as they choose

(H) That Detainee or Committed person have Adequate Access to medical and Dental care.

(i) That Committed or Detainee person be Allowed unfettered practice of religion.

The fact that the Illinios S.V.P. Act exempts all facilities Authorized to recieve S.V.P. from the provision of the mental Health and Developmental Disabilities Code, further evidences of it punitive effect and Intent: In violation of the Equal protection Clause of the U.S. Const Amend "In that it Not in the mental health Codes as All other State".

(9)

(11) The fact that detainee and committed under the Illinois act are treated more like "prisoner" than "patient" is further support that the S.V.P. act is punitive in purpose and effect, and is therefore not civil as the State seen to claim.

When person detainee or committed under the Illinois S.V.P. act are brought to court, we are transported in handcuff, waist belts, Boxcuff, and leg irons.

This is done regardless of the actual amount of danger posed by the individual committed or detainee person. There is no relation to how dangerous the person is, or whether they are a actual flight risk.

This is the hallmark of being a prisoner. In prison, whether you are in there for a forgery, or a murder that is how you transported.

In contrast, no other category of civilly detained or committed person is treated that way unless it is an individually assessed as necessary.

Condition of confinement is "punitive," such that it will violate substantive due process rights of civil detainee, where it is intended to "punish," where it is excessive in relation to its non-punitive purpose, or where it is employed to achieve objectives that could be accomplished in many alternative and less harsh methods. U.S.C.A. Const. Amend 14.



The civil Nature of S.V.P. Confinement provides An important gloss on the meaning of "Punitive" in this context. Because he is detained under civil - rather than Criminal - process, An S.V.P. detainee is entitled to "more" "considrate" treatment" than his criminally detained Counterparts. Youngberg, 457 U.S. At 321-22

There fore when a S.V.P. detainee is confined in Condition Identical to, Similar to, or more restric tive than, those in which his criminal Counterparts Are held, we presume that the detainee is being Subjected to "punishment."

12) That Some of the other Similarities that the Illinias S.V.P. Act Shares with it Criminal Counterparts Include:

A.) That the Act itself is Contained within the Criminal Code instead of the Mental Health Code, or the probate Code As in the State of Kansas.

b.) That the Act lach a Confidentiality Act Similar to the Act Contained in the mental Health And Developmental Disabilities Confidentiality Act which there fore makes Any thing the person say Able to be used Against him.

c.) That the Act provide Section 730 ILCS 5/3-6-4 (of the Unified Code of Correction) Applies to persons Committed under the S.V.P. Act. This provision Says S.V.P. Are to be treated As D.O.C. prisoner, Not patients. The Aushville is under this Code, And the Condition Here Are more restrictive than those in which my Criminal Counterpart Are held.

**11)**   When A S.V.P. detainee is confined in condition Identical to, Similar to, or more restrictive than, those in which his criminal Counterpart Are held, Court will presume that the detainee is being subjected to punishment IN violation of due process clause. U.S.C.A. Const Amend 14

And 12a. Smith, Svonnt.

D.) That it also Class 2 felony for a S.V.P. detainee or Comitted person to escape or Attempt to escape the facility. This is opposed to it civilly detained or Committed person escapes, or attempts to escape from a legitmate psychiatric facility and No crime would or could be charged.

c.) That A person detainee or Committed under S.V.P Act Are Subject to the Same release Notification requirements As prisoner released from Doc for Sex offenses As opposed to regularly committed person whose hospitalization, treatment and release does Not require any type of Notifications.

All of the Above provision, being in contrast to the regular civil commitment Scheme, Are further Indications that the purpose and effect of the legislation is to create A criminal Statute And Not A civil Commitment Statute that was Approved by the U.S. Supreme Court in the <u>Hendrick case</u>.

                                           *Ex post facto*

The Statute IN Illinois is only civil in Nature, Its found in the Criminal Codes, ~~there~~ There for it is criminal by statute by code



13

M.) That in <u>Kansas v Hendricks</u>, the Court ruled that the Kansas statute was not ex post facto because it was aimed at the mental state of the person at the given point in time that the petition is filed.

The important distinction between the Illinios Statute and the Statute in <u>Hendrick</u>, is once again the fact that the Illinios Act only applies to a person who have served virtaully their entire prison sentence.

Under 730 ILCS 5/3-8-5 Act: Tranfer to Department of Human Service: could of been done while that person was in the custody of I.D.O.C. for treatment if they believe he or she had a mental disorder.

Because the Illinios S.V.P. Act so intertwines itself with punishment before its provisions can even begin it violates the U.S.C.A Const. Amend. 14

The decision when to file the petition in Illinios is designed to inflict further punishment and to deprivatio of liberty, "which cannot be allowed." That once the person has been served with the petition, I he is placed into Segregation for 14 days, transferred to the Department of Health and Human Services where I again was placed in Segregation. The State by denying Mr Levi notice of the initial hearing, the ability to represent himself and even be at the initial detention hearing, the State of Illinios deprived the Respondent of his due process right and gained a significant advantage over him. The Right to notice has been deemed fundamental.

In violation of the U.S.C.A Const. Amend 5; 6 + 14

(13) The timing of filing of the Petition has Nothing to do with "uphold the Due process clause", but to violate Due process, And, infact, may be detrimental to An individual respondent's rehabilitative Chances D.)

D) That all of the foregoing is in violation of the Respondent Right under the fourteeth Amendment to Consitution of the United State And his liberty rights Also the 4, 5 And 6 Amendment, And due process.

14 .) That Illinios S.V.P. Act violates the Due process Clauses contained in the United State And Illinios Constitutions. IN order for Someone to be declared to be a Sexually Violent person, ~~that~~ the ~~trier of fact~~

Statute   require the trier of fact to find, Among other thing, that with regard to the person Against whom Commitment is Sought, that it is "Substantially probable" that the person will engage in A Act of Sexual violence" The term " Substantially probable" is So vague in its Application As to render the Act unconstitutional.

15 .) That the term "Substantially probable" is Not defined in the Act, is Not found Anywhere in law, And has No diagnostic meaning in the fields of psychology or Statistic. Without Any clinically recognized meaning or Standard in the Statute, the meaning and Application of the term "Substantially probable" become the Subjective Judgement of each Individual psychologist. Whether A person is Alleged or found to be A S.V.P Should not be left up to the luck of the draw of the psychologist perform the

**14)**

**19)** That various sections of the Illinois S.V.P. Act require a committed person or a S.V.P. detainee, to participate in a psychological examination by experts or professional retained by the State.

The United States and Illinois Constitutions, and Section 207/25 (c)(2) of the S.V.P Act itself, give the Respondent the right to remain silent.

However, subsequent Section of the Act force him to then give up that right in order to exercise even the basic right to present evidence in his own behalf, which is granted by the 6th Amendment.

Section 207/30 (c) of the S.V.P Act requires the person named in the petition to submit to a examination by retained examiner prior to the Commitment trial.

IN <u>Lieberman v. Budz</u> supra, the Court Commented that the initial ex parte detention hearing was akin to an arrest warrant hearing. Lieberman at 937.

Pursuant to Illinois Law, the issuance of an arrest warrant is made pursuant to a "Complaint" that Complaint come from the psychologist who perform the examination: Because the examination than is akin to being question by a police officer.

Indeed, the S.V.P Act States that the proceeding are be considered only civil in Nature (725 ILCS 207/20) However, the act also incorporates a heightened Standard regarding a burden of proof beyond a reasonable doubt (725 ILC 207/35 (d)(1)) thus requirement that all the procedural Right of a Criminal defendant be afforded to the Subject of the Petition (I.E. Appointed of attorney) During examination.

(15)

Illinios provide A Right to Counsel that is broader than the Sixth Amendment right to counsel (See Section [113-3](b) of the Code of Criminal procedure of 1963 State:

That IN all cases, except where the penalty is A fine only, If the Court determines that the defendant is INdigent And desires Counsel, the public Defender Shall be Appointed As Counsel." 725 ILCS 5/113-3 (b)

IN people v. Hall, 114 Ill 2d 376 (1986) this court explained that "the provision of Section 113-3(b) Assure the right to Counsel to an defendant. →
→ Hall, 114 Ill 2d at 402. Sheriff Ronald Levi

So, even if the defendant did Not possess A Sixth Amendment right to Counsel in this case, he did possess A Statutory right to Counsel, As this was Not A case in which the penalty imposed was A fine only.

The U.S. Supreme Court said sex offender Commitment proceeding whether denominated civil or Criminal Are Subject to both equal protection And due process of the fourteeth Amendment. (Specht v. patterson, 866 U.S. 605, 18 LEd 2d 326, 87 SCt 1209 (1967)

I was denied Counsel At examination (IN Violation of my 6th Amendment Right "↓ 725 ILCS 5/183-3(b)
Pursuant to  Illinios Law

The Act then unconstitutionally Coerces the Respondant Submisson by barring his Ability to present Competent evidence on his own behalf if he refuses the State demand. further, Section 207/65 of the Act requires A Committed S.V.P. to Submit Again to an examination before he can have A hearing to be discharged.

**16.**

This is in addition to being required to forfeit his Right to the confidentiality of his treatment in order to even participate in therapy.

Granting a person the right to remain silent, then forcing that person to give up that right in order to retain his basic rights to present evidence in his behalf, to participate in treatment, or to petition for release is a denial of basic due process and is accordingly unconstitutional. (Malloy V. Hogan, 378 U.S. 1 (1964) Minnesota V. Murphy, 465 U.S. 420, 426 (1984)

**17.)** That the S.V.P. Act requires a determination of whether it is "Substantially probable" or "to a certain psychology degree" that the person will engage in act of Sexual violence.

There is currently no reliable or accepted method of making accurate predictions of future behavior as are called for by this Act.

The reliability of future dangerousness prediction has been question by the U.S. Supreme Court, See "Miller Vs. Oregon State prison, 75 F. 3d 369 (9th Cir 1995) citing Barefoot Vs. Estelle, 463, US. 880, 899 n. 7 (1983) and in "Helen Vs. Doe by Doe, 113 S.Ct. 2637 (1993) that Court explained the difficulties inherent in attempting to predict future dangerousness in the area of acquired mental illnesses as compared to the mentally retarded at birth.

Mental Illness, that Court said, unlike mental retardation, can vanish as quickly as it surfaced, Ibid, and, therefore, any prediction of dangerousness within the mentally ill or disordered should be limited solely to the present rather than the future and that is why signs of such dangerousness should be overt and recent

⑭

which has been "deemed Necessary to mitgate the problems INherent IN Accurately predicting dangerousness" see IN re LaBelle, 107 WN. 2d 196, 204, 728 P. 2d 138 (WASH. 1986.)

The SVP Act contains No time limit or time horizon by which to frame this prediction. More over, because the the Commitment Petition is Not filed until After the person has served his prison sentence, the behavior/offense triggering the INquiry is Necessarily remote, IN most cases 5 to 20 years, and there by INcreasing the INAccuracy of the process.

Psychological Science has NotCome far enough to predict to Any reasonable degree of probability, that a particular person will commit (or recommit) A specific type of offense.

Psychologists cAN diagnose, test and treat people, but they cannot predict the future. To pretend that they cAN, And even let them put A percentage firgure or likelihood to it, is so speculative As to violate due process of lAw.

The procedural Component of the due process clAuse requires that the goverment Act in A manner which is fair And just if it does Anything that will directly Affect A person or his or her property. A procedural due process claim has two distinct element: (1) A deprivation of a Constitutional protected liberty or property interest and (2) A denial of Adequate procedural protections: see Hufford v. McENANEY, 2001 WL 536847 *7 (9th cir 2001)

(16)  (quoting Brewster v. Bd. of Ed., 149 F.3d 971, 982 (6th Cir 1998)
Law which are discriminatory, unreasonable, unfair
or which unnecessarily Interfere with personal
freedoms are prohibited by the due process clause.
Due process also requires that procedures used by the
State or government in enforcing the law meet certain
basic standard of fairness.

U.S. Supreme Court Justice Brandeis articulated in
1936 that it is settled that due process clause of the
fourteeth Amendment applies to matters of substant-
ive law as well as matter of procedures. Thus Allfund-
amental rights comprised within the term liberty
are protected by the federal Constitution from invas-
ion by the States. Substantive due process falls within
a category of its own while procedral due process does
likewise and they both make up dual components of
a clause of the United States Constitution, which provide
that no person shall be subjected to the deprivation
of life, liberty or property without due process of law
(see) US Const. Amend. V X IV.

The <u>Addington</u> court devoted a significant portion
of its discussion to the nature of the issue raise here
before the court in a general civil commitment procee
ding under the Texas statute: whether the individual sought
to be involuntarily committed was mentally Ill and
required hospitalzation for his own welfare and for the
the protection of others.

⑲ There may be factual issues to resolve in a commitment proceeding, but the factual aspects present only the begining of the inquiry. whether the individual is mentally ill and dangerous to either himself or other and is in need of confined therapy turn on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists.

Given the lack of certainty and fallibity of psychiatrist diagnosis, there is a serious question as to whether a state could ever prove beyond a reasonable doubt that an individual is both mentally ill and likly to be dangerous...

The subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations.

The reasonable-doubt standard of criminal law function in its realm because there the standard is addressed to specific, knowable facts,

Psychiatric diagnosis, in contrast, is to a large extent based on medical "Impressions" drawn from subjective analysis and filtered throught the experience of the diagnostician.

Id. at 429-30. The court relied on the uncertainties of psychiatric diagnosis and prediction of future dangerousness as the bases for it conclusion that requiring proof beyond a reasonable doubt "may impose a burden the state cannot meet and thereby erect an unreasonable barrier to needed medical treatment. psychiatric analysis eludes the level of certainty required by the reasonable doubt standard

thus violate due process ←



18) That in 1938 the Illinios legislature passed And enacted the Sexually Dangerous Persons Act 725 ILCS 205/1, et Seq in involuntary civil Commitment.

That in Jan 1, 1973 the Illinios legislature passed And reNacted: Tranfer to Department of Human Services Act: 730 ILCS 5/3 8.5
This LAW provide that: that they could at Anytime while a person is in the custody of I.D.O.C. Could have been Tranferred for Treatment ANYONE including those who have a mental Illnes The only reason to wait till completetion of Sentence is for "punitive" measure <u>IN Violation of U.S. Const amend and Equal protection clauses.</u>
That respondent, IN the State petition predicate offense, ON June 15, 2005 was well past the Jan 1, 1938 date of enactment of Said SVP Act 725 ILCS 205/1
Therefore, the State did not believe that the respondent met the requirement for SDP Act. of involuntary civil Commitment at that time, or the State would have file for Commitment under SDP prion to Charge or Trial
That the State while respondent was in IDOC Custody Could have ~~actually~~ Transfer Respondent to D.H.S under 730 ILCS 5/3 8-5. To waited until After Sentence Expiration and then file petition under SVP Act, Then this Action by the State was directly punitive And in Violation of respondent <u>liberty interest</u>

**21)** Right IN due process and equal protection under
Illinios Statutory and Constitutional provisions.
And ~~under equal~~ under the U.S. Const. Amend 5, 6, 14
~~That the IDOC, As~~
That the IDOC, As a State Actor, and upon service
of Summon and State Commitment petition ON
August 18, 2006 ~~under~~ did immediately lock-up
the respondent IN isolation segragation. That this
placement IN Isolation Segragation by the State
Actor, the IDOC, is a policy and practice, Sponsered
privately by the ~~Attorney General's office~~, And
then placed IN Isolation Segragation Again upon
Admission to detention custody with State actor,
the DHS, from Service of petition through the
72 hours and 7 Additional days Continuance in
probable cause hearing. And Such placement
of the respondent IN Isolation Segragation only
Served, IN practice And policy of the State, to
deny, interfer with, and restrict the preparation
of the respondent defense Against the State petition.
the delay in Appointment of Counsel, And all in
policy And practice Serves only to deny, interfer
with, And restrict the respondant in preparation
of defense And exercise of the respondents
Right 5, 6, Amend and 14 Due process And Equal
protection right and in liberty interest rights And
Due process Right



That at the trial of the respondent, in the State's petition predicate offense, in this Court held on or about June 15, 2005, and under the said criminal cause number, was well past the January 1, 1998, date of enactment of the said SVP Act, 725 ILCS 207/1 et seq. Therefore, the State and the Court did not beleive that the respondent met the requirements for SDP Act or SVP Act involuntary civil commitment at that time or the State would have filed for commitment under the SDP Act prior to charge or trial or gave notice to the respondent that he would be eligible for commitment under the SVP Act at expiration of sentence. If there was deliberate and deliberated decision by the State to extend sentence of this Court of the respondent by fore-going SDP Act petition until after sentence expiration and then file petition under the SVP Act petition commitment, then this action by the State was directly punitive and violative of the respondent's liberty interest rights in due process and equal protection under Illinois statutory and constitutional provisions, and under the U.S. Constitution Amendment 5, 6 and 14.

That the State and this Court, by not informing the respondent of being subject to involuntary civil commitment at the time of trial and sentencing did deny respondent adequate notice and time to prepare in defense, and in violation of respondent's due process and equal protection rights and in liberty interest rights, under the Illinois statutory and constitutional provisions, and under the U.S. Constitution Amendment 5, 6 and 14.

That the IDOC, as a State actor, and upon service of summons and State's commitment petition on August 18,2006    , under the said SVP Act, did immediately lock-up the respondent in isolation segragation as afore-said. That this placement in isolation segragation of the respondent by a state actor, the IDOC, is a policy and practice, sponsered privately by the Attorney General's Office, and then further the respondent placed in isolation segragation upon admission to detention custody with the state actor, the DHS, from service of petition through the 72 hours and 7 additional days continuance in probable cause hearing; and such placement of the respondent in isolation segragation only served, in practice and policy of the State and state actors, to deny, interfer with, and restrict the preparation of the respondent in defense against the State's petition. that further this policy and practice of the State and state actors extends to late and 11th hour filing of petition, delay in appointment of counsel, and all in policy and practice serves to deny, interfer with, and restrict the respondent in preparation of defense and exercise of the respondents afore-said rights.



### ISSUE TWO

That the respondent did not receive adequate notice and of hearing in the State's actions in making the respondent subject to the said SVP Act, 725 ILCS 207/1 ET SEG., AND AT EACH CRITICAL STAGE OF THE CONSTITUTIONAL JEOPARDY OF THE RESPONDENT"S LIBERTY INTEREST, AND IN VIOLATION OF DUE PROCESS AND EQUAL PROTECTION CLAUSES UNDER ILLINOIS STATUTORY AND CONSTITUTIONAL PROVISIONS, AND UNDER THE U.S. CONSTITUTION AMENDMENT 5, 6 AND 14.

### ISSUE THREE

THAT THE RESPONDENT WAS WITHOUT ADEQUATE NOTICE AND TIME TO PREPARE A DEFENSE DUE TO THE ACTIONS OF THE STATE AND STATE ACTORS, IN THE IDOC AND DHS POLICY AND PRACTICE AND IN DEPRIVING THE LIBERTY INTEREST RIGHTS IN DUE PROCESS AND EQUAL PROTECTION OF THIS RESPONDENT AS AFORE-SAID AND UNDER ILLINOIS STATUTORY AND CONSTITUTIONAL PROVISIONS, AND THE U.S. CONSTITUTION AMENDMENT 5, 6 AND 14.

### ISSUE FOUR

THAT THE RESPONDENT WAS REFUSED APPOINTMENT AND ASSISTANCE OF COUNSEL AS REQUESTED AT EVALUATION OF THE RESPONDENT FOR STATE"S PETITION IN INVOLUNTARY CIVIL COMMITMENT UNDER THE SAID SVP ACT, 725 ILCS 207/1 ET SEG., AND IN VIOLATION OF LIBERTY INTEREST RIGHTS AND IN VIOLATION OF DUE PROCESS AND EQUAL PROTECTION OF ILLINOIS STATUTORY AND CONSTITUTIONAL PROVISIONS, AND UNDER THE U.S. CONSTITUTION AMENDMENT 5, 6 AND 14.

### ISSUE FIVE

THAT THE RESPONDENT WAS NOT ADVISED OF HIS CONSTITUTIONALLY PROTECTED RIGHTS AND ALL OTHER APPLICABLE RIGHTS AT THE FIRST AND AT SUBSEQUANT PROBABLE CAUSE HEARINGS ON AUGUST 21, AUGUST 28, SEPTEMBER 21, OCTOBER 11, AND DECEMBER 5, 2006, IN AND BEFORE THE BAR OF THIS HONORABLE COURT, AND IN VIOLATION OF ILLINOIS STATUTORY AND CONSTITUTIONAL PROVISIONS, AND UNDER THE U.S. CONSTITUTION AMENDMENT 5, 6 AND 14.

That prior notice of the State's intent to file petition for respondent's involuntary civil commitment is a requirement in protection of liberty interest rights in due process and equal protection of the law. Such said notice extends from the first actions of the state and state actors to jeopardize the respondent's liberty interest by making him subject to involuntary civil commitment by the State's petition, and said notice requirement further extends to any action by the state or state actors that interfers with, restricts, or denies adequate time for the respondent to prepare a defense by himself and through counsel.



Washington v. Texas, 385 us 14 (1967), declares rights to call witnesses and compell winesses to testify.

The First Circuit held that the inmate was entitled to be notified promptly whenever each of the critical steps imposed by the statute as a prerequisite to adjudication of sexual dangeerousness was taken and that he could not be kept in the dark concerning actions so vital to his future. Sarzan v. Cauham, 489 F2d 1076 (1st Cir.).

In order to ensure a fair and impartial trial, a defendant must be told of the nature of the proceedings against him/her and given advance notice of the time and place of his trial. Snyder v. massachusetts, 291 US 97 (1934).

[N]otice must be served "to the fullness of his opportunity to defend against the charge." U.S. V. Widgery, 778 F2d 329 (7th Cir.).

The Court noted that the "procedural safeguards in place are not mere technicalities to be sidestepped. Rather, the legislature created them to protect people from the deprivation of liberty interest. Demir, 322 IllApp3d at 994, 256 IllDec 226, 751 NE2d at 619.

See all other issues presented as applicable.

## ISSUE SEVEN

THAT UNDER ILLINOIS STATUTORY AND CONSTITUTIONAL PROVISIONS, AND IN STATE CREATED STATUTORY LIBERTY INTEREST RIGHTS, AND UNDER THE U.S. CONSTITUTION AMENDMENT 5, 6 AND 14; FURTHER, IN THAT THE RESPONDENT WAS MANDATED BY STATUTE TO BE BROUGHT BEFORE THE BAR OF THIS COURT WITHIN 72 HOURS, EXCLUDING SATURDAYS, SUNDAYS AND LEGAL HOLIDAYS , FOR PROBABLE CAUSE HEARING ON THE STATE"S PETITION IN INVOLUNTARY CIVIL COMMITMENT BY VIRTUE OF THE SAID SVP ACT, 725 ILCS 207/1 ET SEG., AS SPECIFIED BY LEGISLATIVE INTENT EXPRESSED BY CLEAR, EXPLICIT AND MANDATORY LANGUAGE OF THE SAID STATUTORY PROVISION, 725 ILCS 207/30(b).

## ISSUE EIGHT

THAT, IN VIOLATION OF RESPONDENT"S RIGHTS AND UNDER ILLINOIS STATUTORY AND CONSTITUTIONAL PROVISION, AND UNDER STATUTORY CREATED LIBERTY INTEREST RIGHT, AND UNDER DUE PROCESS AND EQUAL PROTECTION CLAUSES OF THE ILLINOIS AND U.S. CONSTITUTION(S) AMENDMENT 5, 6 AND 14; AND FURTHER THE RESPONDENT WAS HEARD IN PROBABLE CAUSE IN THIS INSTANT CAUSE AND BEFORE THE BAR OF THIS COURT BEYOND THE CLEAR, EXPLICIT AND MANDATORY STATUTORY TIME LIMITATION OF "NO MORE THAN 7 ADDITIONAL DAYS" IN CONTINUANCE OF HEARING OF SAID PROBABLE CAUSE, (725 ILCS 207/30 (b) ; AND SUCH CONTINUED PROBABLE CAUSE HEARING(S) WERE WITHOUT STATUTORY AUTHORITY AND WITHOUT JURISDICTION OF THE COURT, AND AS EXPRESSED BY CLEAR, EXPLICIT AND MANDATORY LANGUAGE IN LEGISLATIVE INTENT IN STATUTORY CONSTRUCTION.



In re Kortee, 317 IllApp2d 111,115-16, 250 IllDec 514, 738 NE2d 982 (2000); In
re Trevino, 317 App3d 324, 329, 251 IllDec 524, 740 NE2d 810 (2000), The Illinois
courts "have consistently held" that, in context of the SVPA, due process requires
"that the respondent be entitled to defend himself on a 'level playing field'
and that the State not be permitted to maintain a strategic advantage over the
respondent when 'that advantage casts a pall on that proceeding.'"
That the conditions and circumstances leading up to the first probable cause hearing
and beyond into the multiple continuances of probable cause are exactly what the
court spoke to in Kortee and Trevino, Id., That those said practices and policies
created by the State and state actors, in the IDOC and DHS, were specifically
tailored for SVP respondent's answering petition by the State in probable cause.
That these said policies and practices by the State and state actors were establish-
ed and encouraged and even sponsored by the Illinois Attorney General's Office
for use in SVP Act commitment case prior to probable cause hearing, and did destroy
any possiblity of a 'level playing field' for the respondent, and thereafter a
'pall' was 'cast' over all of the proceedings following even to violation of
fundamental fairness in due process and equal protection rights of the respondent
as afore-said.
That this respondent did not waiver nor willingly forfeit any known statutory
nor constitutioinal right.
Forfeiture is failure to make a timely assertion of a right, whereas, waiver
is the intentional relinquishment or abandonment of a known right. U.S. V. Olano,
507 US 725, 733, 113 SCt 1770, 1777, 123 LEd2d 508 (1993) (quoting Johnson V.
Zerbst, 304 US 458, 464, 58 SCt 1019, 1023, 82 LEd2d 1461 (1983).
The requirements for involuntary civil commitment under the SDP Act, 725 ILCS
205/1 et seq., and the SVP Act, 725 ILCS 207/1 et seq., are the same under due
process and equal protection rights. In re Varner, 537 US 802, 157 LEd2d 3, 123
SCt 69 (2002); People v. Masterson, 207 Ill2d 305, 798 NE2d 735 (2003).
Thus, all fundamental rights comprised within the term liberty are protected by
the Federal Constitution from invasion by the states. (Justice Brandeius, (1936),
U.S. Suppreme Court); (citing Hannah v. Larche, 363 US 420, 422, 80 SCt 1520,
4 LEd2d 1307 (1960).

The Ninth Circuit explained that "a liberty interest protected by the Fourteenth Amendment may be derived from the Due Process Clause itself or from the laws of the states. Browning v. Vernon, 44 F2d 821 (citing Hewit v. Helms, 459 US 460, 466, 103 SCt 864, 868, 74 LEd2d 675 (1983).

Im 1957 the Illinois Supreme Court held that insofar as constitutional requirement of due process are concerned it was of little significance that the sexually dangerous person proceeding was civil in nature, and one who might be deprived of his liberty as a consequence of being adjudicated a sexually dangerous person must be accorded the protections of due process. People v. Capoldi, 10 Il12d 261, 139 NE2d 776 (1957).

Smith v. Bennett, 365 US 708, 712, 81 SCt 895, 897, (1961), The U.S. Supreme Court held that "the labels afixed to either the proceeding or to the relief imposed are not controlling and will not be allowed to defeat the applicable protections of federal constitutional law.

The U.S. Supreme Court said sex offender commitment proceedings whether denominated civil or criminal are subject to both equal protection and due process of the Fourteenth Amendment. Specht v. Patterson, 866 US 605, 18 LEd2d 326, 87 SCt 1209 (1967).

Dispite the apparent civil nature of a sexual paschopathy proceeding, sound logic and fundamental justice dictate the applicability of due process normally in criminal cases and concluded both equal protection and due process clause of the Fourteenth Amendment apply in civil commitment proceedings, Id. Specht v. Patterson, 886 US 605.

A defendant may confront all witnesses against him and question under oath to disprove their testimony. Pointer v. Texas, 380 US 400 (1965).

In 1967 the U.S. Supreme Court said that failure to grant such procedural safeguards as a hearing and right to confrontation violated due process requirements of the 14th Amendment. Specht v. Patterson, 386 US 605 (1967).

Right of effective assistance of counsel was granted by the U.S. Supreme Court underdue process and equal protection clauses in Strickland v. Washington, 466 US 668 (1984); Genders v. U.S., 425 US 80 (1976); Heiting v. N.Y., 422 US 853 (1975).

People v. Succop, 67 Cal2d 785, 63 Cal Rptr 569, 433 P2d 473, (cert. denied, 390 US 983, 19 Led2d 1281, 88 SCt 1104 (1967), Court held that it violated due process because nothing in the record showed the individual was advised of his right to make a reply, and to produce witnessess or evidence in his behalf at probable cause stage.

Pointer v. Texas, 380 US 400, declares due process right to confront witnesses and right to be present in court to participate in own defense.

(23)    19.) When A SVP Act detainee is confined in
Condition identical to, Similar to, or more
Restrictive than, those in which his criminal
Counterparts are held, court will presume that
the detainee is being Subjected to punishment
in violation of Due Process clause. U.S.C.A
Const. Amend 14.

 IN fact here in D.H.S. the Condition are more
Restrictive than those of I.D.O.C.
 IN that if I want to Spend my money for
Such thing AS: A AM/FM CASSETTE CD player
it must be approval by DAVE BEIRMANN who is
A Sta. 4.
 If you want to buy Anything Such As A
H.D. TV ANtenna or Newpaper A car + Driver
magzine or taster choice coffee:
 He has denied me my Right to Spend my
money AS I choose.
 That even in IDOC you can spend your
money AS you choose, there are No Restriction
AS the are Here.
 Further more I had a magzine that was
Coming in the MAIL; because A lady in A Swim Suit
WAS on the cover it was denied: A King magzine
month of Nov 2007: there are No Such Restriction
in d.o.c.
 They have even Segragate the gym in that
we can only go with our unit: which I.D.OC doe
Not do

State of Illinois
Department of Human Services - Treatment and Detention Facility

# INFORMAL GRIEVANCE RESIDENT ATTEMPT TO RESOLVE
# STAFF PROBLEMS/COMPLAINTS FORM



| Name of Resident: | Date of Occurrence: | Date Submitted: | Unit: |
|---|---|---|---|
| RONALD LEVI | 4-15-07 | 5-31-07 | 03-11 |
| Date Received by Grievance Examiner: | ARF 871231 | 06 07 AR 0177 | |

**Nature of Complaint**

☐ Attitude/Conduct   ☑ Job Duty   ☑ Policy/Rule   ☐ Staff Orders   ☐ Other

Brief Summary of Problem/Complaint:

I PLACE A ORDER to JACK L MARCUS
ON 4-15-07 for CASSETTE Ribbon
AND RCA CASSETTE Player
It is the END OF MAY AND THAT
order HAS NOT been Sent out
THIS IS ~~oter~~ ~~tut~~ INTeR PRINTerferary
with me being Able to defend my
self IN court, because I Need
thus Type worter Ribbon

of request:

I would like My order
Send out when they areplaced
Not a month later     over



State of Illinois
Department of Human Services

# TDF Resident Grievance - Appeal Form

| Name of Resident: **Ronald Levi** | ID #: **871231** | Date of Submitted: **12-03-07** | Unit: **D-3-11** |
|---|---|---|---|
| Date Received by Administration: | | Grievance #: **10 07 GR 0719** | |

USE BLACK INK ONLY

SUMMARY OF GRIEVANCE APPEAL:

under Due process clause of the U.S.C. A Const Amend 14 A person who have been involuntarily detained Are entitled to more considerate treatment And Condition of Confinement than criminal whose conditions of Confinedment Are designed to punish.

The I.D.O.C. Send out mail IN 3 to 5 day under the 14th Amend I can Not be treated more with more Restriction than my criminal Counterpart

The grievance on 6-15-07 ( Grievance # 07 07 GR 0471 WAS upheld ON Same ground, Now 9-26 IS denied for Same claim 10 07 GR 0719 which Show that there is No policy for Correcting this mail handling issue

I want My mail Send out IN 3 to 5 day Just like The I.D.O.C.

Resident's Signature: ℵ _____

ALL GRIEVANCE APPEALS MUST BE FILED ON THIS OFFICIAL GRIEVANCE APPEAL FORM

Grievance must be filed within 30 days after receipt of the Facility Director's response. Please attach the grievance with the Grievance Examiner's report and the Facility Director's decision. Forward to the Grievance Examiner.

IL462-5006 (R-4-06)                                                      Page 1 of 1

State of Illinois
Department of Human Services - Treatment and Detention Facility



# ORDER APPROVAL

One form must be completed for each vendor from which items are being requested.

Resident Name: _Ronald Levi_   DHS Number: _871231_   Date: _12-3-07_

Housing Unit: _D-3_   Room Number: _11_   Responsible Living Status: _C_

Name of Vendor: _Target_

Vendor Address (if applicable): _____

Enter description for each item being requested. Include model name, model number, item description, and item order number, as appropriate. Enter only one item per line.

Item 1. _AM/FM Cassette CD player_

Item 2. _____

Item 3. _____

Item 4. _____

Remainder of form for administrative use only.   _I have one from 7-10-07 But was told I need to put in another because it was over 90 day ago_

○ Approved   ☒ Denied
Comments:

_Not on status for C.D Player_

Security Therapy Aide II Signature: _____   Date _____

Security Therapy Aide IV Signature: _____   Date _12-8-07_

If order approved, the following signatures required to verify dispensation of items by Storekeeper and receipt by Resident.

Resident Signature: _____   Date _____

Storekeeper Signature: _____   Date _____

Distribution:   Mailroom - Original
                Resident - Two Copies

IL 462-5604 (R-06-07)

Page 1 of 1

State of Illinois
Department of Human Services - Treatment and Detention Facility



# ORDER APPROVAL

One form must be completed for each vendor from which items are being requested.

Resident Name: **Ronald Levi**    DHS Number: **871 231**    Date: **11-28-07**

Housing Unit: **D-3**    Room Number: **11**    Responsible Living Status: _____

Name of Vendor: **Radio Shack**

Vendor Address (if applicable): _____

Enter description for each item being requested. Include model name, model number, item description, and item order number, as appropriate. Enter only one item per line.    *I Already have a D10 TV But Don't have a antenna picture Not clear*

Item 1. **HD TV Antenna    33.99**

Item 2. _____

Item 3. _____

Item 4. _____

Remainder of form for administrative use only.

◯ Approved    ☒ Denied

Comments:

Security Therapy Aide II Signature: _____    Date _____

Security Therapy Aide IV Signature: _____    Date **11-30-07**

If order approved, the following signatures required to verify dispensation of items by Storekeeper and receipt by Resident.

Resident Signature: _____    Date _____

Storekeeper Signature: _____    Date _____

Distribution:    Mailroom - Original
                 Resident - Two Copies

IL 462-5604 (R-06-07)



That these Action are the policy And practice of D.H.S. IN depriving the Right And to further restriction every INdividual here in violation of the U.S. Const. Amend 14

20) That Liberty Healthcare has denied me my INdividualized treatment plan one that is tailor to me which will Not violate my Religious belief. US constitution Amend 1. that I have A Right too the free excise of my Religious belief

IN that Liberty Healthcare has one treatment plan that they give to everyone IN Such it violate U.S. Const. Amend 14. because I Am A INdividual And Should Not be treat like everyone. ONE Plan for everyone is simple wrong.

21.) IN that D.H.S interfer with the processing of the mail; when order Are place it take from 4 to 6 wk for A order to go out.
IN that I.D.O.C. places order IN 3 to 5 day therefore D.H.S. is more Restrictive that my Criminal Counter part therefore IN violation of Due process of the U.S. Const Amend. 14.

Shaney v. Winnebego, Social Service, 489 U.S. 189, 103 L.Ed.2d 249, 109 S.Ct 998 (1989)

Their lack of Staff should not be my problem. Continuing failure to provide individualized treatment Cannot be Justified by lack of Staff or facility.

Rouse v Cameron, 373 F.2d 451, 458, (D.C. Cir 1966)

wolff v Donnell 418 U.S. 539, 94 S.Ct 2963, 41 L.3d 2d 935 (1974)

Younger v. Gilmore, 404 U.S. 15, 92 S.Ct 250, 30 L.3d 2d 14

Bound v Smith, 430 U.S. 817, 828, 97 S.Ct 1498, 52 L.3d2d - 72 (1977)

I ASK for individualized treatment because of my Religio[n] I have spent four and half year learning how to control my thought thru my Religious belief Conforming to the word of God.

our thoughts Are the Silent builder of the temple we live in. what we Continve to think About and what we delight in tell more Accrurately what our spiritual Condition is.

The mind must be exercised like the body, thinking About good wholsome things. one way to Conquer evil thought is to Stay AWAY from Steration that can Stimulate wrong thinking; they wANt to Sudject me to the wrong think of 13 other individual And I do Not Need the evil And deviate thought of 13 other individual in my head.

8

I do Not Need the evil And deviate thought
of 13 other people in my head 6 hrs A day 5 time Aweek
The mind is like A garden that can grow either beautiful
flower or weed; And must be guard Constantly from letting
in the wrong thought of 13 other individual. It is why
I asked for individualized treatment Such As
"full circle outReach christ center Ranches"
"my brother keeper" "Saint Leonard house" "Joshua house"
There is individualized treatment and Spiritual
treatment out there; because my Religious belief Are
every thing to me Now; And I was told that Religion
is Not well in group.
where there is A clearly established body of law that
Applies to All civilly Committed person, there is No reason
that the law Should Not Apply to those designated As
S.V.P. As well: for, the State cannot have it both way
if Confinement of A  S.V.P. is civil for the purposes
of evaluation under the ex post facto clause, that
Confinement is civil for the purposes of defining the
Right to which the detainee is entitled while Confine
civil status mean civil status; with All the Right
that accompany it:  4th 6th 14th Amendment
1 Amendment The Right of freedom of thought And of
Religion As guaranteed by the Constitution; Against
State Action:

9

State of Illinois
Department of Human Services



## TDF Resident Grievance

| Name of Resident: Ronald Levt | ID #: 871231 | Date of Incident Occurrence: 7-19-07 | Unit: D-3-11 |
|---|---|---|---|
| Date Received 7-20-07    07-24-07 A07:57 | | Grievance #: COPY See note 7/23/07 | |

**Nature of Grievance**

☐ Personal Property ☑ Staff Conduct ☐ Mail Handling ☐ Meals ☐ Medical ☐ Other (Specify): _____

☐ Disciplinary Report:    Report Date: _____    File ATK

(Attach copy of Notice of Appearance Before The Behavior Committee and Behavior Committee Decision.)

Use only this form to give a BRIEF Summary of Grievance:

I Put in A Request for my Note At Staffing on 6-14-07. I got those Note on 7-19-07 No were in then did it mention; that I Ask for A Treatment Plan that does Not voclate my Reglious belief. Not to mention Such Valuable information show plain deceit on DR overhousing part, and show he can Not be trusted. So I Ask Again At the pod meeting in front of Staff And Resident but got NO Answer

Relief Requested: I WANT it MAY Apart as my Record that I Ask for treatment that did Not voclate my Reglious belief

☐ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreperable harm to self.

Resident Signature: Ronald Levt    Date: 7-20-07

IL462-5001 (R-6-06)    Distribution: Master File; Resident    Page 1 of 2

State of Illinois
Department of Human Services

## TDF Resident Grievance

| Name of Resident: RONALD LEVI | ID #: 871231 | Date of Incident Occurrence: 6-14-07 | Unit: D3-11 |
|---|---|---|---|

| Date Received 06-20-07 P01:07 IN | Grievance #: 06 07 GR 0442 |
|---|---|

Nature of Grievance

☐ Personal Property  ☑ Staff Conduct  ☐ Mail Handling  ☐ Meals  ☑ Medical  ☐ Other:  (Specify): **Treatment**

☐ Disciplinary Report:   Report Date: _____

(Attach copy of Notice of Appearance Before The Behavior Committee and Behavior Committee Decision.)

Use only this form to give a BRIEF Summary of Grievance:

ON 6-14-07 I have A staffing with DR overhousing, DR procter AND other staff memeber, I ASK to have A treatment PLAN that will NOT voilate my Religon BELIEf, SINCE the Sign (" we focus on the individualized State treatment NEED of Residente") AND WAS told that would NOT happen.

6/20/07

Sandra

OFFICIAL SEAL
SANDRA J. HAYS
COMMISSION NO. 655223
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 7-11-2010

Relief Requested:  I AM Asking for a treatment plan that Does Not Voilate my Religion Belief

☐ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

Resident Signature:  Ronald Levi    Date: 6-15-07

462-5001 (R-6-06)          Distribution:  Master File; Resident          Page 1 of 2

Christ has taught me:

Now the Just Shall live by faith; but if ANYONE DRAW BACK, my Soul has NO pleasure in him

→ my belief Are voilated If:

I AM NOT to discuss my Sin with AN unbeliever, After being forgive by my heavenly father + Christ.

→ my belief ARE voilated if

I AM to Judge Another person who is still living IN Sin, KNOWING that I once WAS like him, before being Redee,

my belief ARE voilated if:

when After being BORN AGAIN, thru the Blood of Christ, I ~~Aloud~~ Allow A NON believer Judge me:

Roman 8:1 tell us:

There is Therefore Now NO Condemnation to those who ARE in Jesus the Christ, who Do NOT WALK According to the flesh, but According to the Spirit:

Peter 3:10 States:

for let him who want to enjoy life AND See good Day, keep his Tongue free from evil And his lip from guile.

Once I have Repent of my Sins I am not to look back on what has happen before I knew my heavenly father and Savoir Jesus the Christ.

PHILIPPIAN 3:13

Brethren, I do not count my self to have apprehended; but one thing I do, forgetting those things which are behind and reaching forward to those things which are ahead.

Christ has taught me in Luke 9:62 not to look back

But Jesus said to him "No one having put his hand to the plow, "And Looking back" is fit for the Kingdom of God.

The teaching of Christ tell us that "Do not allow your thought to Return to the former person that you were but "State"

Roman 12:2

And do not be comformed to this world, but be transformed by the renewing of your mind, that you may prove what is good and acceptable and the perfect will of God.

I Am Not to Criticize or Judge ANyone:

And only my heavenly father AND my lord AND SAvoie Jesus chrrst CAN Judge me.

There ARe treatment that you do Not ~~habe~~ Need to discuss what is Already Know

like Saint LeNaRD house
like my Brother Keeper
like Joshua Housse
may God Bless you
　　　　　Ronald Levi

Shaney V. Winnebego, Social Service, 489 U.S. 189, 103 L.Ed. 2d 249, 109 S.Ct 998 (1989)

Their lack of Staff should not be my problem. Continuing failure to provide individualized treatment Cannot be Justified by lack of Staff or Facility.

Rouse V Cameron, 373 F. 2d 451, 458, (D.C. (1966)

Wolff V Donnell 418 U.S. 539, 94 S.Ct 2963, 41 L.3d 2d 935 (1974

Younger V. Gilmore, 404 U.S. 15, 92 S.Ct 250, 30 L.3d 2d 14.

Bound V Smith, 430 U.S. 817, 828, 97 S.Ct 1498, 52 L.3d 2d - 72 (1977)

I ASK for individualized treatment because of my Religio I have Spent four and half year learning how to control my thought thru my Religious belief Conforming to the word of God.

Our thoughts are the Silent builder of the temple we live in. what we Continue to think About and what we delight in tell more Accurately what our spiritual Condition is.

The mind must be exercised like the body, thinking About good wholsome things. one way to Conquer evil thought is to Stay Away from Stention that can Stimulate wrong thinking; they want to Sudject me to the wrong think of 13 other individual~~~~ And I do not need the evil And deviate thought of 13 other individual in my head.

8

I do Not Need the evil And deviate thought
of 13 other people in my head 6hrs A day 5 time A week
The mind is like A garden that can grow either beautifu
flower or weed; And must be guard Constantly from lett
in the wrong thought of 13 other individual. It is why
I asked for individualized treatment Such As
" full circle outReach christ center Ranches"
"my brother keeper" " "Saint Leonard house" "Joshuahous
There is individualized treatment and Spiritual
treatment out there; because my Religious belief Are
every thing to me Now; And I was told that Religion
is Not well in group.
where there is A cleerly established body of law that
Applies to All civilly Committed person, there is No reason
that the law Should Not Apply to those designated As
S. V. P. As well: for, the State cannot have it both wa
If Confinement of A S. V. P. is civil for the purposes
of evaluation under the ex Post facto clause, that
Confinement is civil for the purposes of defining the
Right to which the detainee is entitled while Confine
civil status mean civil status; with All the Right
that Accompany it: 4th 6th 14th Amendment
1 Amendment The Right of freedom of thought and of
Religion As guaranteed by the Constitution; Against
state Action:

9



DHS. Randomly Searches Rooms And unit, that Resident Are placed under excessive Security, that mail is censor And denied on ground As Such: The lady on cover is wear A Swin Suit or Jean Are cut to Shorts or your people Send a picture that has a child in them that Just happen to been your Nephew or Niece or family even tho your victam was A Adult.

That this the conditions and restriction at the Center at DHS were not reasunably related to A legitimate Non punitive goal.

There Are Resident who have not been to Court in years And Are Not Committed.

Fred S. Berlin, M.D., Ph.D.
Associate Professor, The Johns Hopkins University
            School of Medicine
founder, of The Johns Hopkins Sexual Disorden Clinic.
Director, National Institute for the Study, Prevention And Treatment of Sexual Trauma: has done A report on Illinios S.V.P program Exhibit 2 has States:

That the program's practices And policies regarding discharge planning and release to less restrictive Settings represents A Substantial departure from accepted practice, Judgement, and/or Standard in the field of Impatient mental health care.

Exzibit 1

By


**Fred S. Berlin, M.D., Ph.D.**
**Associate Professor, The Johns Hopkins University**
**School of Medicine**
**Founder, The Johns Hopkins Sexual Disorders Clinic**
**Director, National Institute for the Study, Prevention**
**and Treatment of Sexual Trauma**


October 16, 2003
Baltimore, Maryland

# TABLE OF CONTENTS

QUESTIONS PRESENTED FOR CONSIDERATION.............................................2

OPINIONS.....................................................................................................3

PROFESSIONAL BACKGROUND.....................................................................5

BASES OF OPINIONS......................................................................................6

## QUESTIONS PRESENTED FOR CONSIDERATION

I.   Describe whether the following aspects of the program substantially depart from accepted practice, judgment and/or standards in the field of inpatient mental health treatment:

    A.   the program's practices and policies regarding individualized treatment and treatment planning;

    B.   the program's practices and policies regarding confidentiality of information about residents;

    C.   the program's practices and policies regarding admission of offense history, including the program's use of the polygraph;

    D.   the program's practices and policies regarding medication;

    E.   the program's practices and policies regarding security, classification, and restrictions on communications, visitation, property and liberty;

    F.   the physical structure and layout of the program;

    G.   the program's practices and policies regarding communicating appropriate treatment goals and timeframes to residents and making clear what is required to progress in treatment;

    H.   the program's practices and policies regarding discharge planning and release to less restrictive settings;

    I.   the program's ability to correct its problems and errors, including practices and policies relating to supervision, quality improvement, peer review, resident grievances, licensure and accreditation.

II.  Does the sex offender program provide residents with a meaningful chance to improve and win their eventual release?

OPINIONS

I.    The Program departs from accepted practice, judgment and/or standards in the field of inpatient mental health treatment in the following ways:

A.    Individualized Treatment – **The program lacks a commitment to provide treatment in as efficient, and time-limited a fashion, as can be safely done.**

B.    Confidentiality – **The program requires patients to both (a) waive confidentiality, while at the same time, (b) fully disclosing all of their prior sexual offenses.  This is done despite of a lack of any credible evidence showing that either waiving confidentiality, or disclosing fully, has been associated with an enhanced treatment outcome.**

C.    Offense History and Polygraph – **The program requires residents to acknowledge the truthfulness of most, if not all, suspicions and allegations regarding prior sexual misconduct.  Some such suspicions may not be true.**

**The program places an over-reliance upon the polygraph, treating it, in effect, as if it was virtually an infallible "lie detector," in such a fashion that its use improperly hinders an orderly progression through treatment.**

D.    Medication – **The program does not consistently provide sex-drive-lowering medication to all of those for whom it can be helpful.**

E.    Restrictions on Liberty – **The program's practices and policies regarding security, restrictions on communications, visitation, property and liberty interests seem to be more in keeping with those more typically found in a prison, as opposed to a mental health facility.  That would appear to be so even when compared with hospital facilities of the sort that routinely deal with potentially dangerous, involuntarily committed patients.**

**The program appears to do very little to try to immediately differentiate, at the time of admission, specifically which patients may need a heightened level of security management, as a consequence of posing a significant imminent risk to others.  It is important to appreciate that there will be patients, perhaps a majority, who will not pose any such risk within a secure setting. The program appears to treat almost all patients as if they are an ongoing high risk, employing amongst other methods both nightly lock-downs, and permanent listening devices, for a relatively lengthy period of time following admission, and generally for much longer.  Absent clear justification, patients should not be treated in such a fashion.**

**The program's practice of secluding patients into their own rooms (including potentially suicidal patients) for lengthy periods of time, without a timely review, should not be seen as acceptable.  Nor should the practice of**

- 3 -

publicly stigmatizing some patients by placing them into an yellow jump suit, when clearly less demeaning options could be exercised.

F. Physical Structure - Much of the physical structure and layout of the facility unnecessarily creates a prison-like atmosphere and ambiance. In my judgment, that should be seen as both detrimental and unacceptable, with respect to the care, dignity, mental health needs, and comfort of patients; patients who, in this instance, are not prisoners.

G. Communication - At times, both staff and patients have been unclear as to exactly what constitutes currently acceptable treatment expectations.

H. Discharge - The slow pace of progress through treatment by almost all of the patients, combined with a general lack of feedback regarding likely length of stay, evidences a lack of resolve and commitment with respect to advancing residents through treatment in as timely a fashion as is safe.

The use of actuarial tools such as the Static-99 to assist in trying to determine an individual patient's likely future risk, does not represent a valid approach. The decision to do that should be re-examined. A clear statement of the criteria used to evaluate treatment success, and thus readiness for discharge, is needed. The details of that assessment process should be as transparent as possible, rather than being either mysterious, or unduly vague. Residents considered in need of additional institutionalized care should receive specific written feedback regarding what factors were considered in arriving at such a decision; how much weight was accorded to each; why they are not ready for community-based treatment; and what they can do behaviorally to make themselves ready. They should also be given some sense of approximately how long further treatment might be expected to take if they remain fully cooperative.

Thus far, the program appears to have done relatively little to establish, or to liaison with, an effective community-based conditional-release program that is seen as an integrated, and appropriately weighted part, of an overall treatment package. The devaluation, or insufficient weighting of the importance of such an ongoing community-based follow-up program, can improperly retard the advancement of patients through the residential phases of inpatient care by restricting their subsequent options.

I. Supervision - The program, including any "independent" assessors, and/or any conditional outpatient follow-up program, should have an ongoing relationship with, and independent oversight by, an established hospital, and/or mental health accreditation agency. In my judgment, the Illinois Department of Human Services, which is a state-administered entity, does not, for the reasons noted below, have sufficient independence to qualify for such a purpose.

II.    There is Little Chance for Meaningful Improvement and Eventual Release as evidenced by the following:

    A.    Arousal Re-Conditioning - **The program has assigned too central a role to attempting to recondition erotic arousal. That is a controversial method that has not generally been shown to be clinically efficacious.**

    B.    Tactics Group - **Another obstacle to progress in treatment is the practice of removing persons from "core therapy," and instead placing them into a "tactics" group, as will be described below, without an independent system of checks and balances.**

## PROFESSIONAL BACKGROUND

I have both a Ph.D. degree in psychology as well as a medical degree, and I practice professionally as a licensed physician. I am board certified as both a psychiatrist, and as a forensic psychiatrist, by the American Board of Psychiatry and Neurology. I am also an associate professor at The Johns Hopkins University School of Medicine, and an attending physician at The Johns Hopkins Hospital.

My particular area of expertise within psychiatry is related to the paraphilic disorders (i.e., in laymen's terms, the "sexual deviation disorders"), which includes conditions such as pedophilia. I have served as a member of the subcommittee on the paraphilic disorders for the Third Revision of the Diagnostic and Statistical Manual of Mental Disorders (DSM III-R), and in addition to possessing considerable clinical experience in that area, I have also done a good deal of teaching and research in the field as well. As documented in my professional vitae, I have published extensively (including articles on both the treatment and recidivism rates of sexual disorders), and I have done numerous peer reviews for both major medical journals, as well as for the National Institute of Mental Health. The treatment program that I currently direct has been designated as a National Resource Site by the United States Department of Justice.

My experience as a psychiatric physician has included caring for sexually disordered patients both as outpatients in the community, and as hospitalized inpatients. In addition, I have also treated a number of sexually disordered patients in prison as well, continuing to treat some of them subsequently following their reentry into the community. My inpatient experience has included the treatment of both voluntary, and involuntarily committed patients. Most of the committed patients had been hospitalized because they represented an imminent danger to either themselves or others, rather than because they were sexually disordered, although some, indeed, had been.

erotic attraction to women in general, while at the same time, perhaps, enhancing his sexual feelings for prepubescent children. In terms of accrued knowledge, and everyday life experiences, most persons would likely question whether it would even be possible to significantly de-condition in a sustained fashion one's sexual attractions towards a given class of partner, irrespective of whether that category of partner is an adult woman, or a prepubescent child. How many of us would believe that our sexual interest in the category of partner towards whom we have always been attracted could somehow be significantly, if not permanently, de-conditioned out of us?

In spite of the above-noted reservations, there is evidence that a variety of behavioral therapy methods can be employed to de-condition various forms of "deviant arousal" in a laboratory setting. For instance, by employing a device know as the penile plethysmograph (which can document the degree to which a man has achieved an erection), it has been possible to show that certain individuals, who prior to treatment had obtained full erections when exposed to either audio or visual stimuli depicting children, would subsequently no longer do so following certain forms of "de-conditioning" treatments in a laboratory setting. However, unfortunately there is a lack of good evidence documenting that such relatively short-term changes, as have been demonstrated in the clinical laboratory, are necessarily predictive of long-term behavioral change in the community. To put it somewhat crudely, what matters in treatment is not how a man's penis behaves in the laboratory, but how he is going to behave over time in society.

Historically, at a time when consenting adult homosexual activities had been prosecuted criminally, similar behavior therapy methods had been utilized to try to de-condition homosexual attractions, replacing them instead with heterosexual feelings. After reviewing that treatment literature, the American Psychiatric Association has taken the stance that attempts to recondition sexual orientation have been both ineffective, as well as ethically questionable. Although that policy statement was developed in the context of attempts to recondition homosexuality, precisely the same principles and procedures are involved when attempting to de-condition pedophilic, and other forms of "deviant arousal."

Having made that point, I see no harm in continuing to offer such treatment to men who may indicate that they are finding it to be helpful, so long as the potential limitations of such treatment are, at the same time, also fully appreciated. What I do find to be unacceptable, is the lack of a specific policy statement that makes it clear, especially to the "independent" risk assessors, that the continued presence of "deviant arousal" (for example, evidence of a continued sexual attraction to children), should not necessarily be weighed heavily, in determining whether or not any given individual has successfully completed the residential phases of his care.

Many persons can experience arousal with respect to an unacceptable partner. Furthermore, one does not necessarily have to use a device such as the penile plethysmograph (or another technique called the Abel Screen) to know that that is so. The important issue in treatment is not whether a person is still experiencing such attractions, but that he has reached the point where he will no longer act on them. To the extent that the program may make it difficult for a man to progress through treatment if he still shows evidence of "deviant arousal," as measured by the penile plethysmograph in the clinical laboratory, in my professional opinion, that would present a substantial departure from accepted practice, judgment, and/or standards in the field

- 7 -

of inpatient mental health care. Although, statistically the presence of "deviant arousal" has sometimes been associated with an increased risk of sexual recidivism, that does not mean that each specific person who shows such arousal is himself necessarily at such a heightened risk. In my judgment, a policy statement to that effect is essential.

Another potentially unjustified roadblock to progression through treatment (although not necessarily in all instances), is the practice of removing persons from aspects of "core therapy," by instead placing them into a so-called "tactics group." That group is intended to teach patients how not to use improper tactics (for example, intimidation or manipulation), but to instead apply the lessons learned in treatment. Although at first glance, such an approach can seem quite reasonable, and although treatment staff must be accorded some degree of latitude in making professional judgments, it also has the potential for inadvertent abuse. That is so, because it can become all too easy to dismiss genuine differences of opinion, or differences in construals or perception, as tactics that are an impediment to treatment. Thus, when a therapist is trying to get others to see things his (or her) way, he is generally viewed as being "persuasive," whereas when a patient tries to get others to see things his way, there is the risk that he will be viewed as being "manipulative." Engaging in permissible legal suits can be viewed as a tactic; sitting quietly and keeping to one's self can be viewed as an instance of being "isolative and withdrawn;" and vigorously expressing a different point of view can be labeled as "resistant to treatment, lacking in empathy, and oppositional." Talking in therapy about the possibly improper actions of teenaged victims, or about one's own childhood victimization, can be viewed either as "a failure to assume responsibility," or as "taking a victim's stance." Of course, each such observation about a given patient in treatment could actually, in point of fact, be quite accurate. However, because there is such a tremendous disparity in power between staff and patients, in my judgment, it is imperative that some truly independent system of checks and balances be put permanently in place to avoid any such inadvertent abuse of that power.

It appears to me, in the case of the program, given the lack of independent oversight and patient advocacy that exists there, that the rights of patients to be dealt with fairly in treatment could inadvertently be compromised. In spite of the fact that it is a publicly funded entity, and in spite of the unique vulnerability of its patient population, the program is subject to review by no independent accreditation entity, nor does the facility provide impartial patient advocacy assistance. In my professional opinion, that represents a substantial departure from accepted practice, judgment, and/or standards in the field of inpatient mental health treatment.

Finally, as will be discussed in greater detail below, when establishing treatment protocols practitioners are ordinarily expected to provide at least some ballpark estimate about how long any such treatment is likely to take. That is necessary in order to be able to make administrative decisions based upon an expected length of stay. It is also important in that patients and their families ought to have some general idea about what to expect. Lastly, it is necessary in order to allow for proper financial planning. Individualized treatment plans for each patient are also needed, as not all patients will require precisely the same therapy protocol.

: providing inpatient mental health care, it is critical that patients be able to stay for as long as is :eded, but at the same time, particularly given its high cost, treatment should not be prolonged necessarily. Clearly, there will be those who deviate from the norm for a variety of reasons,

- 8 -

and clearly special care must be taken in the case of those whose conditions make them a potential risk to others. Nevertheless, in my professional opinion, that does not obviate the need to try to provide treatment in as timely and expeditious a fashion as is possible. Furthermore, if a goal of such treatment is to allow individuals to reenter the community as safe and productive citizens, then if it is truly treatment, at some point one would expect to see such an outcome occurring.

Currently, out of a total of approximately 129 committed patients at the facility, 61 are in pretreatment (prior to Phase I), and 17 are in no treatment. That statistic means that over 60% (78/129) are in either pretreatment, or receiving no treatment at all. While some of that may be due to patient resistance, in my professional opinion that statistic nevertheless is suggestive of a possible systemic problem.

Given the large numbers of patients, the length of time that many of them have been there, and the small number who have progressed with the support of staff to a less restrictive, although potentially still highly supervised, community-based phase of treatment (let alone, to one of the more advanced phases of inpatient residential treatment), one can only question the resolve of achieving such goals in a timely manner. Thus far, in spite of the fact that the program has been in existence for a number of years, and in spite of that fact that there have been estimates by some program staff that treatment may need to average about three years in length, less than a handful of patients have been advanced to the latter phases of the treatment program. It is unclear that the program has recommended any more than three patients for conditional release.

Clearly, public safety must come first. However, that raises the risk that a "cover one's behind attitude" could interfere with a proper and timely progression through treatment. I am unaware of any evidence suggesting that long-term institutionalized care has been associated with an enhanced outcome when treating sexually disordered patients. As with alcoholism and drug addiction, a period of inpatient care is often quite helpful initially, followed by a lengthy period of intensive community-based supervision, monitoring, and support. In spite of public misperceptions to the contrary, the recidivism rate for many sex offenders treated in the community has been quite low.

One can ask, "How can the public be kept safe?" Alternatively, one can ask, "How in the context of keeping the public safe, is it also possible to still be fair and just to committed patients in treatment?" These two questions are not the same, and only the latter question may lead to a commitment to try to treat patients in as expeditious a fashion as possible. In my judgment, individualized treatment planning seems not to have considered recommending, and trying to assist, even some small percentage of patients in progressing through all five phases of inpatient care at a relatively accelerated rate. In fact, few, if any, patients have ever even progressed to level five. Of course, in order for a patient to be able to progress into, and beyond level five, the program would first need to have put into place an established system that would allow for a subsequent lengthy period of intensive community-based supervision, monitoring, support, and the possibility of re-hospitalization if needed, following inpatient discharge. In my professional opinion, to the extent that that sort of individualized treatment planning has not been done, planning to try to get each patient through the system in as safe, and expeditious a fashion, as is possible, that represents a substantial departure from accepted practice, judgment, and/or

standards in the field of inpatient mental health care, even when one takes into account the nature of the population in treatment.

**I.(B)  My professional opinion about whether the program's practices, and policies regarding confidentiality of patient information about residents represents a substantial departure from accepted practice, judgment, and/or standards in the field of inpatient mental health treatment is as follows:**

The program, which is a nonprison-based program, requires each resident in treatment to waive his generally accepted right as a patient to have his therapy records, and other ordinarily privileged communications, maintained in a confidential fashion. In addition, all of the information gathered in treatment can be shared, and at times apparently has been shared, with both the Office of the Attorney General and the Office of the States Attorney. The fact that that is so puts the program's service providers into a complicated dual role, that of both treatment provider and potentially (though not necessarily intended) government informant. Finally, patients cannot progress through treatment, towards the possibility of an eventual release back into the community, should they refuse to provide full disclosure regarding any and all of their prior sexual offenses, including those for which they may not have been previously charged criminally.

The consequence of the above-noted policy presents a catch-22 for each patient in treatment. On the one hand, should he choose to fully disclose the existence of previously un-prosecuted offenses, he runs the risk of self-incrimination with the attendant potential possibility of a future loss of liberty. That loss could occur either as a consequence of additional prosecutions (which is still a possibility even if certain victim information has not been self-disclosed), or as a consequence of the state utilizing the information in question in an effort to continue to sustain his involuntary commitment. On the other hand, by virtue of the current practices of the program, should he refuse to make such a full disclosure, he would not be able to progress through treatment, thus once again jeopardizing his own liberty interests. Either way, by disclosing or by not disclosing, he has in effect, been compelled to put his own liberty interests in jeopardy.

The above-noted policy becomes even more difficult to understand, given the fact that there is no credible evidence suggesting that either such a waiver of confidentiality, or such a full disclosure, improves the likelihood of success in treatment. In treating drug addiction, it can be important to know what type of drugs the patient has been using, and how frequently he has been doing so. However, it is not ordinarily necessary to know all of the details surrounding each of his prior drug experiences in order to diagnose him as an addict, or in order to treat him effectively. The same is ordinarily true when treating sexual offenders. If it is clear that a man is sexually attracted to children, what is important from the treatment perspective, is not necessarily to know all of the details of each and every one of his prior offenses, but more importantly to know that he now has the resolve, the capability and the support necessary so that he will not offend again.

If, in spite of the above-noted comments, the program feels that it is still nevertheless important to have full disclosure, ironically both common sense, and the professional research literature,

- 10 -

would suggest that one of the best ways to accomplish such an end is to ensure each patient complete confidentiality. Such confidentiality is what enables most patients to feel comfortable about revealing very personal, possibly embarrassing, and sometimes shameful information to their therapists during the course of routine everyday mental health treatment. In my professional opinion, the program's practices and policies regarding confidentiality of patient information (particularly with the respect to compelling the disclosure of prior criminal acts) represents a substantial departure from accepted practice, judgment, and/or standards in the field of inpatient mental health care.

**I.(C)  My professional opinion whether the program's practices, and policies regarding admission of offense history, including the program's use of the polygraph, represents a substantial departure from accepted practice, judgment, and/or standards in the field of inpatient mental health treatment is as follows:**

I believe that I have already expressed my professional opinion regarding the issue of requiring a full disclosure of the patient's prior offense history. Therefore, at this point, I will confine my comments primarily to the use of the polygraph.

The program has what it refers to as three core tracks to its treatment program. These tracks have been labeled (1) relapse prevention, (2) cognitive restructuring, and (3) journaling. In order to advance through treatment to the point of possible discharge, each patient must successfully complete all five phases of each of those three tracks. However, one cannot fully complete the second phase of treatment without first passing a polygraph examination. In order to pass, the results cannot ordinarily be either equivocal, or suggestive of deception. Thus, failure to "pass" the polygraph can represent a potential permanent roadblock to the successful completion of treatment.

The polygraph can sometimes be helpful in treatment. For example, a patient may reveal useful information to a polygrapher prior to actual testing because he does not want to appear to be holding back. In addition, for some patients in treatment, the knowledge that they are going to be polygraphed may act as both a reminder, and as an incentive, to maintain good conduct. However, at the same time, use of the polygraph can also run the risk of contributing to a "we versus they" mentality between patients and their treatment providers, potentially undermining the development of a positive doctor/patient relationship.

Beyond that, it is important to appreciate the limitations of the polygraph as well as its potential strengths. Some patients may falsely admit to prior offenses if they feel that they "need to play that game" by falsely disclosing significant numbers of past bad acts, because they have begun to believe that that is the only way that they will be able to progress through treatment. Polygraphers rarely ask patients whether they have falsely claimed to have committed an offense, when in point of fact they may not have done so. More importantly, a recent review of the polygraph by the prestigious National Research Council cautioned that use of that technology is far from infallible. As with any technology, there can be both false positives (in the case of the polygraph, the appearance of lying when none is present), and false negatives (the appearance of a truthful response in the face of deception). I know of no evidence that shows that polygraph testing, when used as an ancillary tool in the treatment of sexual offenders, has

been shown to lower the subsequent rate of future recidivism, even though some have reportedly claimed that those who have passed a polygraph examination may be more likely to remain free for longer periods of time in the community, than those who have failed it.

Having made the above-noted points, I nevertheless do not feel that it is necessarily improper to use the polygraph, in selected instances, as one means of gathering information that may be useful in treatment. However, it should not be utilized, as if it were, in effect, virtually an infallible "lie detector." For the program to attribute to it sufficient weight that it can act, in effect, as a potential permanent roadblock to progression through their five phases of treatment, in my professional opinion, represents a substantial departure from accepted practice, judgment, and/or standards in the field of inpatient mental health treatment.

Finally, with respect to the issue of demanding full disclosure about one's prior offense history, it is important to note that treatment should not be turned into an ongoing debate about past guilt or innocence. Such matters are often best resolved in a court of law, rather than through a therapy session. Occasionally persons are falsely convicted. Sometimes the observations of past victims, or past hearsay, may not be entirely accurate. Polygraph testing can sometimes be suggestive of deception when none is present. The primary purpose of therapy is to try to ensure that there will be no future bad acts. Just as it is not always necessary to debate with the alcoholic how often he has been drunk in the past in order to treat him successfully, it is not always necessary, or perhaps even possible, to try to establish "guilt or innocence" regarding each and every alleged prior bad act in order to successfully treat sexual offenders. The thrust of treatment needs to focus instead on what each treated individual must do in order to safeguard both the future interests of society, as well as his own future success. In my professional opinion, debating, perhaps indefinitely, potentially irreconcilable accusations and denials, does not represent a form of good, or even psychiatrically acceptable, treatment. To the extent that that may be how certain aspects of therapy are being conducted, in my professional opinion that represents a substantial departure from accepted practice, judgment, and/or standards in the field of inpatient mental health care.

## I.(D) My professional opinion about whether the program's practices and policies regarding the use of medications represents a substantial departure from accepted practice, judgment, and/or standards in the field of inpatient mental health treatment is as follows:

The primary category of medication that has been utilized to treat sexually disordered offenders is that category which is capable of lowering the intensity of unacceptable erotic cravings. Thus, medications in that category such as Depo-Lupron, and/or Depo-Provera, when administered to sexually disordered individuals, are utilized in effect as "sexual appetite suppressants." Some programs have also attempted to utilize another category of medication known as the Selective Serotonin Re-uptake Inhibitors. However, they have not been shown to be capable of lowering testosterone, which is the primary hormone in males that, in effect, energizes sexual drive.

Cravings of the type targeted by medications which lower testosterone may be those related to either an unacceptable type of partner, such as a child (as occurs in pedophilia), or to those related to an unacceptable type of behavior (as can occur in sexual sadism, a condition in which

- 12 -

the individual in question experiences intense, recurrent eroticized cravings about the suffering, degradation and/or humiliation of others).  Such treatments will also reduce the intensity of conventional sexual interests as well.  Sex-drive-lowering medications are ordinarily not utilized in the case of sexual offenders whose prior criminal acts had been more the product of a lack of conscience and moral responsibility, than the product of intense recurrent eroticized pathological cravings, with which the individual in question, through no fault of his own, has been afflicted.

The intent of utilizing sex-drive-lowering medications is to enhance an individual's capacity to exercise adequate volitional self-control.  Just as an effective appetite suppressant can make it easier to diet, without making it impossible to eat, medications such as either Depo-Provera or Depo-Lupron can help an individual to be better able to control his sexual drive, rather than, in effect, having it control him.  According to the courts, possessing some degree of volitional impairment is one of the hallmarks that justifies the civil commitment of certain sexual offenders.  These medications, though neither an absolute guarantee, or a panacea, are specifically intended to enhance such volitional capabilities.

There is a huge volume of scientific data showing the relationship between low levels of testosterone (as induced by these medications) and a markedly diminished frequency of sexually motivated behaviors.  Even more importantly, the induction of lowered levels of testosterone has specifically been associated with a significantly deceased rate of criminal sexual recidivism.  As with any medical treatment, the relative risk/benefit ratio of such treatments must always be considered before they are prescribed.

An essential element in providing any form of medication treatment is to first obtain fully informed consent from a prospective patient.  In giving informed consent, the standard of care would ordinarily mandate that a discussion of the various alternative treatment options also occur.  Unless there is some valid medical reason for denying a fully informed patient access to a treatment that may be of some benefit to him, such treatment is ordinarily not withheld.  Furthermore, contrary to the apparent policy of the program, absent some valid medical reason, patients are not ordinarily denied access to a given form of treatment unless they have first agreed to some other form that is thought to be "less intrusive."

For example, severely depressed patients, who may benefit from electroconvulsive therapy (ECT), are not ordinarily denied access to such treatment unless they will first agree to an extended clinical trial of an antidepressant medication.  Certainly, they may choose to undergo such a trial first, and they may even be advised to do so, but, if after being fully informed of their treatment options they would prefer ECT as a potentially quick and effective means of addressing their severe depression, they would ordinarily be afforded such an option.

It would appear that the program does not discuss early on in treatment, with all of the various sexually disordered patients there who might be appropriate candidates, the possibility of obtaining access to sex-drive-lowering medications in a timely fashion.  Absent some valid medical reason not to do so, and keeping in mind the fact that the men are patients and not prisoners, in my professional opinion the failure of the program to provide fully informed consent about such treatment options in a timely fashion represents a substantial departure from accepted practice, judgment, and/or standards in the field of inpatient mental health care.

- 13 -

I.(E)  My professional opinion about whether the program's practices and policies regarding security, classification, and restrictions on communications, visitation, property and liberty represents a substantial departure from accepted practice, judgment, and/or standards in the field or inpatient mental health treatment is as follows:

When working with potentially dangerous patients, mental health practitioners have an obligation both to the patient, himself, as well as to other members of the treatment staff, and to the community at large, which can include other patients. Because this differs from most other doctor/patient relationships in which the primary obligation is ordinarily directed almost exclusively towards the patient himself, great care must therefore be taken in the context of protecting others, not to either improperly, or unnecessarily, impinge upon a particular patient's rights and comfort.   Most mental health facilities, even those dealing with involuntarily committed patients, are ordinarily supportive of the concept of a "patients' bill of rights."

In working with and evaluating potentially dangerous patients, the clinician must routinely assess each individual's prior track record. For example, in the case of patients being treated by the program, it should generally be possible to quickly find out, whether any specific individual entering treatment has previously been either physically threatening or assaultive during any prior periods of incarceration, or during time previously spent in the community.  Many persons with pedophilia, for instance, will likely have had no prior record of either physically threatening or assaultive behavior, and many of them will likely pose very little, if any, threat to other adults, either residents or staff, at the treatment center.

Given the fact that the program's patients are residing in a secured and locked facility, which helps to ensure against the possibility of escape, and given the fact that they can be observed easily, for many such patients any further intrusion upon their rights and liberties would, in my judgment, require both clear justification, as well as a clear consideration of any potentially less onerous options.   Absent specific evidence of an imminent security risk, it would also be important, if patients are to be restrained, or otherwise managed behaviorally, that the decision to do so be made clinically (given that they are patients), rather than by security staff.  Any unnecessary restrictions regarding family visits, aesthetics, communications, privacy and so on should be avoided.

It is my understanding that persons in treatment are routinely strip searched prior to meeting with visitors, sometimes including their own attorneys. Absent clear justification for doing so, it is difficult for me to appreciate why it is that patients in treatment should be subjected to such a potentially embarrassing and demeaning procedure.  If there is a concern about concealed weapons, then surely metal detectors could be employed. If there are concerns about illegal drug usage, then routine random screening of either urine or blood can easily be done. Furthermore, it is not clear to me why one would ordinarily need to be concerned that patients might be trying to covertly remove either weapons or drugs from the treatment facility, or why, absent specific evidence, they might be considered a threat to visitors, or loved ones.  Ordinarily, the concern would be to prevent any attempt to bring in such items. In my professional opinion, these types of routine strip searches, which at best are based upon both an uncertain and an unconvincing

- 14 -

rational, depart substantially from accepted practice, judgment, and/or standards, within the field of inpatient mental health treatment. Although it may be the case that there are other facilities that do treat involuntarily committed residents more like prisoners than like patients, in my professional opinion as a physician, it is still nevertheless improper to do so.

The program utilizes two primary methods to seclude patients. One is called "special status," and the other, "close status." In the case of special status, patients, including those who may potentially be suicidal, are locked into their rooms. In the case of close status, they are locked onto one of the treatment units, and at the same time required to wear a yellow jumpsuit. Residents who have been assigned to special status (including those who may have been either self-injurious, or suicidal) are apparently ordinarily subsequently "stepped-up" to close status, a management level at which they must then remain for at least the next 30 days. The decision to place a patient into a close management status is one that does not even involve his primary therapist.

A patient can be involuntarily placed into special status (that is, locked into his room) by a security-therapy aide. According to policy, the decision to place him there, and to continue to maintain him there, must then be reviewed by a "behavioral review committee" within two working days. Assuming that weekends are not ordinarily considered to be routine work days, that would suggest that a patient could remain so confined from a Friday until a Tuesday evening.

In my professional opinion, the decision to seclude a patient to his room should be made only when less restrictive alternatives, such as ongoing one-to-one close observation, are thought to be inadequate. In addition, if it does become necessary to either seclude, or to restrain a patient, that decision should be reviewed on an ongoing basis by a mental health professional, certainly within a matter of hours (if not sooner), rather than days. Potentially suicidal patients should ordinarily be afforded an immediate opportunity to speak with a mental health professional, and they should be provided with ongoing emotional comfort and support. Seclusion and unnecessary isolation of such a patient should be avoided whenever possible. Patients should also be afforded greater privacy when meeting with their individual case managers.

In my professional opinion, the practice of allowing a patient to remain in locked door seclusion, including one who may be suicidal, sometimes for a period of days, without a more timely review, represents a substantial departure from accepted practice, judgment, and/or standards within the field of inpatient mental health care. Additionally, potentially stigmatizing patients on close management status by requiring them to wear prison-like garb (e.g., a yellow jumpsuit) while restricted to their housing units also represents such a substantial departure. In point of fact, in my professional opinion many of the practices and policies regarding security, classification, restrictions on communications, visitation, property and patient liberties are more typical of those often seen in a prison environment, rather than of those ordinarily found within a therapeutic setting. That is likely so, even with respect to most inpatient settings that involve the care of potentially dangerous involuntarily committed individuals. Parenthetically, it might be noted that the current clinical director of the program has had only minimal, if any, prior professional experience working in an inpatient mental health hospital facility of the sort that routinely deals with potentially dangerous involuntarily committed patients.

- 15 -

Residents are by definition patients and not prisoners. Therefore, unless the facility can affirmatively demonstrate that the numerous onerous conditions that currently affect patient comfort, dignity, and personal freedoms represent the only viable alternative, I find it difficult to justify such a substantial departure from accepted practice, judgment, and/or standards. Simply stating that such measures are necessary for security purposes, absent compelling evidence that less restrictive options of the sort more typically found in a mental health setting would not be adequate, is in my judgment unacceptable. In point of fact, residents in the Advanced Group Status are afforded a number of additional freedoms and benefits (e.g., personal belongings may be sent in from family or friends, with prior written approval), suggesting that the philosophy of the institution is that a resident must first earn such allowances, rather than that he should be deprived of them only in the event of a justifiable reason.

The argument that this population of patients necessitates such an approach might be applicable, in part, although even that might be debatable, to that subgroup of the population who have manifested a prior history of either physical violence or assaultiveness within a closely supervised and secure setting. In my clinical experience, that would by no means be applicable to an entire population of sexually disordered persons in treatment, and in point of fact, would very likely be applicable to only a small minority. Men with a history of rape should not ordinarily be left alone in the presence of a vulnerable adult, until a judgment has been made that it would be safe to do so.

**I.(F)    My professional opinion about whether the physical structure and layout of the program represents a substantial departure from accepted practice, judgment, and/or standards in the field of inpatient mental health treatment is as follows:**

A fundamental tenet of quality mental health care is that patients should be treated in as dignified and humane a fashion as is possible. Towards that end the physical structure and layout of a treatment facility can take on both practical and symbolic meaning. In most cases residents entering treatment are doing so following a considerable period of incarceration, and at a time, when having paid their debt to society, they had been expecting to return back home. Instead, they have been informed that they must now undergo a further deprivation of liberty in order to receive needed mental health care.

In my judgment, under such circumstances, it is especially important that clinicians attempt to develop as good a rapport as possible with their patients, and that the patients be able to appreciate that they will be cared for in what is clearly a therapeutic milieu. To the extent possible, a "we versus they mentally" between patients and staff needs to be avoided, and within the context of appreciating the right of society to be safe, patients need to have the sense that the staff cares about them as people. In order to be properly motivated for treatment, each patient needs to believe that if he works hard, there will be the possibility of a "light at the end of the tunnel." He also needs to know that his care providers are highly motivated and sincere in their desires to assist him towards ultimately reentering the community, at some reasonably-defined future date, as both a safe and responsible citizen.

- 16 -

Were a person to first be blind-folded, and then be placed at the center of the admissions unit, upon opening his eyes, in my judgment at least, it would be difficult for him to imagine that he had been placed into a therapeutic milieu, as opposed to a more punitive prison-like environment. In applying that "blind-fold test," in my judgment there is nothing that an arriving resident sees, in terms of physical structure and layout, when first entering the admission area that is suggestive of a therapeutic milieu. Furthermore, his subsequent sustained period of locked-in confinement will likely do little to improve or rectify such a perception.

For a person who has already paid his debt to society, and who has now been placed into the program in order to receive needed mental health care, there is virtually nothing about the physical structure and layout that would convey the message of a genuine interest in responding to his mental health needs as a patient. For those entering the facility, under what are clearly very delicate and difficult circumstances, the program looks like a prison and feels like a prison. To the extent that that is so, particularly given the importance of trying to motivate and to convince entering residents, and their loved ones, that they are there for treatment rather than for further punishment, in my professional opinion the physical structure and layout of the facility substantially departs from accepted practice, judgment, and/or standards in the field of inpatient mental health care.

**I.(G)  My professional opinion about whether the program's practices and policies regarding communicating appropriate treatment goals, and timeframes to residents, and making clear what is required to progress in treatment, represents a substantial departure from accepted practice, judgment, and/or standards in the field of inpatient mental health treatment is as follows:**

When patients with a mental disorder enter a hospital for treatment, as noted previously they and their families are ordinarily interested in having some general idea about how long their treatment will be expected to take. Similarly, both treatment staff and hospital administrators also need to have some such idea in order to provide for proper staffing, financial planning and a host of other relevant needs. Finally, those paying the bill would want to be certain that treatment is both effective, as well as time and labor efficient. Obviously, in the case of any given individual, there can be a number of factors that can either shorten or extend his anticipated length of stay. However, in general patients should be expected to have at least some sense of how long their treatment providers feel that their treatment is likely going to take. They should also be able to know precisely what they must do to progress through treatment. For example, from a patient's point of view, showing a decline or an absence of "deviant arousal," may not be an attainable treatment accomplishment. That is, some of them may not be able to learn how to do that.

Thus far, only a handful of patients at the facility have progressed to the more advanced phases of treatment. In general, when patients inquire about how long they are likely to have to remain in treatment, it would appear that the answers given are generally very vague (responses that often seem to say little more than "we will have to see" or "it depends"). In addition, treatment staff, who presumably should know the patients well, seem hesitant to take a stand regarding their progress in treatment. Instead, the stance of staff often, in effect, seems to be "we treat, we

do not predict risk," deferring such decisions about diminished risk (and hence about treatment progress and success) to either "independent evaluators," or to the court.

In both theory and practice, I would have no objection to a truly, independent, objective second opinion regarding progress in treatment, and the court, of course, should surely exercise its legislatively mandated role. However, treatment providers still need to be willing to take a stand, and to express a reasoned opinion, about the degree of success or failure of any given patient in treatment. How can one treat without having some sense about whether or not it is working?

There are some who have argued (an argument with which I do not necessarily agree) that clinicians are not good at predicting treatment outcome. Be that as it may, a primary role of the clinician is to manage risk by working hard to reduce it, and clinicians must be willing to answer questions from patients and others about how well they feel they are succeeding, and about why it is that they feel that way.

Internal audits performed by various team leaders at the facility have sometimes differed greatly from one another about how treatment plans should possibly be changed. Reportedly, some auditors have felt that only 10% of the treatment plans in place had met the required standards, whereas others had found that as many as 85 to 90% had indeed done so. If the staff itself is sometimes so diverse in its opinions about what constitutes adequate treatment expectations, and success in treatment, how can patients be expected to have a clear understanding of exactly what it is that they must do? Prolonging the length of stay needed by requiring patients to document in writing seemingly endless details about prior alleged offenses, in my judgment serves only to aggravate the possibility of delaying a timely progression through treatment even further. In my professional opinion, such a situation of ongoing vagueness and uncertainty, accompanied by a general unwillingness on the part of treatment providers, to provide patients with reasonably specific feedback about how well they are doing, and about approximately how much longer residential treatment will likely need to go on, represents a substantial departure from accepted practice, judgment, and/or standards in the field of inpatient mental health treatment.

**I.(H)  My professional opinion about whether the program's practices and policies regarding discharge planning and release to less restrictive settings represents a substantial departure from accepted practice, judgment, and/or standards in the field of inpatient mental health care is as follows:**

As with alcoholism and drug addiction, most persons with sexual disorders and related conditions, will require both acute, as well as long-term, care and support. Just as the alcoholic must learn that he or she manifests a particular vulnerability that must continually be addressed through ongoing self-vigilance, the same is often true for persons with sexual disorders including the most common sexual disorder treated by the program, which is reportedly pedophilia. Even though their conditions are treatable, one would ordinarily not expect to maintain either an alcoholic, or a person with pedophilia, in long-term residential care, expecting that by the time of his release his condition would have somehow been cured.

Trying to predict in some crystal ball fashion who will succeed in treatment over the long haul, whether it be the alcoholic or the person with pedophilia, can be far less successful than

- 18 -

effectively managing that person's risk over time. Such effective risk management, as opposed to risk prediction, can help to "stack the odds" in favor of a successful treatment outcome. For example, arranging for the person with pedophilia to live in a supervised setting where his actions can be closely monitored following his discharge from residential care, would likely represent a more effective way of addressing the issue of future risk, than trying to predict it in a vacuum.

Thus far, at least, the program's approach would seem to be much more heavily weighted towards risk prediction than towards planning for subsequent longer-term community-based risk management. Such management should include both monitoring and support, following a possible conditional release. If one goal of treatment is, in some reasonably foreseeable timeframe, to help at least some significant number of persons in treatment reenter the community, then, in my judgment, the early and timely implementation of such follow-up planning would appear to be crucial.

Currently, in doing discharge planning, the program depends heavily upon a so-called independent assessment. The evaluator performing that "independent assessment" ordinarily performs four functions.   (1) He (or she) reviews each patient's file (which includes documentation of any polygraph and penile plethysmograph data) in order to perform a "treatment progress review."   (2) He interviews the patient clinically.   (3) He performs two psychological tests (the Millon Clinical Multiaxial Inventory – III, and the·Multiphasic Sex Inventory – II), neither one of which has shown itself to be capable of either accurately predicting sexual recidivism, or of predicting the need for institutionalized mental health care. (4) He utilizes two actuarial tools (the MNSOST-R, and the Static-99) in order to perform a "risk analyses."

In my judgment, actuarial tools such as the Static 99 can say little about the likely future risk of any given individual. For example, actuarial methods (i.e., statistical methods) can be used to predict that a certain group of individuals (for instance, obese male diabetics who have both high levels of cholesterol and hypertension) will, as a group, be at heightened risk of having a heart attack. However, given the fact that many men within that group will still nevertheless not have a heart attack, actuarials cannot be used to accurately predict specifically which men within such a group are more or less likely to do so.

Analogously, actuarials can be used to screen out a group of men to be considered for possible civil commitment, and they have indeed often been used for such a purpose. However, they cannot then be used to make specific and accurate predictions about the future prognosis of any given previously committed individual within such a group.

To the extent that the program, albeit via so-called "independent evaluators" (i.e., evaluators who are not a part of the treatment team), is utilizing actuarial tools to assist in trying to predict the future risk, and readiness for release from inpatient care, of a specific patient currently in treatment, in my professional opinion, that represents a substantial departure from accepted practice, judgment, and/or standards in the field of inpatient mental health care. Unfortunately, there may be others who have also been misusing actuarials to assist in trying to make accurate predictions about the risk of specific individuals in treatment, and about their readiness for

discharge, but the fact that others may also be misusing them in such a fashion does not constitute justification for continuing to do so. As noted above, actuarials can be used to screen out a group of individuals to be considered for possible civil commitment. However, any attempt to use an actuarial tool such as the Static-99 to assist in predicting either treatment success, or the likelihood of recidivism of a previously committed individual, could be both prejudicial, misleading and invalid.

**I.(I)   My professional opinion about whether the program's ability to correct its problems and errors, including practices and policies related to supervision, quality improvement, peer review, resident grievances, licensure and accreditation represents a substantial departure from accepted practice, judgment, and/or standards in the field of inpatient mental health care is as follows:**

It is my professional opinion that there seem to be a good number of dedicated persons at the facility who are working hard to try to address the above-noted concerns, including concerns such as quality improvement. However, the facility is not currently under any independent oversight by an accepted mental health inpatient accreditation agency, such as, for example, the Joint Commission on Accreditation of Health Care Organizations (JCAHO). In my professional opinion, it is crucial that such an accreditation process by put into place.

The program is charged with providing care, comfort and therapy to a highly stigmatized population of patients who have few obvious advocates likely to insist that they receive humane and just treatment. In addition, there is tremendous public pressure, because of understandable fear and the desire to be safe, that can be expected to exert an influence opposed to conditional discharges and release. Finally, it had been the state itself, the very same state that is ultimately responsible for the running of the publicly funded program, who had requested the civil commitment of those being treated there in the first place.

Given those realities, in my professional opinion, it would be extremely important to have independent accreditation oversight. Such oversight should be performed by an organization dedicated both to ensuring the safety interests of the community, as well as to ensuring the adequacy of efficient and humane treatment protocols. It should also try to ensure that patients move through therapy within as reasonable a timeframe as is safely possible. If there are those for whom such a possibility cannot be achieved, because of legitimate concerns about community safety, then it would still be important to try to ensure that they are nevertheless being maintained in a comfortable and therapeutically structured non-punitive environment, with as little infringement upon their personal rights and liberties as can be reasonably achieved. To the extent that no such independent accreditation agency is currently providing monitoring of grievances, assurances about ongoing quality improvement, and a generalized oversight of performance standards at the facility (a facility which is a publicly funded non-penal state-run entity), in my professional judgment that represents a substantial departure from accepted practice, judgment, and/or standards in the field of inpatient mental health care.

II.    **My professional opinion about whether the program provides residents with a meaningful chance to improve, and to win their eventual release is as follows:**

As currently constituted, for many of the reasons noted above, including the fact that according to one estimate, the facility is apparently now planning to discharge perhaps only one patient per year, I have not been able to conclude, with reasonable medical certainty, that the program is providing most residents with a meaningful chance to improve, and to win their eventual release in a timely manner. In point of fact, very few patients have been able to move effectively through the system in any sort of a reasonably defined timeframe, even if measured in years. Beyond that, thus far, the staff have recommended very few conditional releases. That, in spite of the fact that there is published data documenting that there are some therapeutic programs that have had success in managing and treating patients, similar to at least some of those currently housed in the program, safely in a community-based setting.

Respectfully submitted,

*Fred Berlin* (signature)

Fred S. Berlin, M.D., Ph.D.
Associate Professor, The Johns Hopkins University
   School of Medicine
Founder, The Johns Hopkins Sexual Disorders Clinic
Director, National Institute for the Study, Prevention
   and Treatment of Sexual Trauma

October 16, 2003


Copy: File of Hargett, et al. versus Baker, et al #02C1456

Illinius S.V.P. have A Right, As Are All other state which has A S.V.P. programs to be under the "mental health And develope mental Disabilities Code". A S.V.P. program that exclude itself from such code can not be gear toward treatment their for unconstitutional under Equal protection of the law And Due process clause.

The remedy Here however, is Not to invalidate the legislature handwork under the double Jeopardy Clause, but to eliminate whatever excess in Adminstration Contradicts the Statute's civil Character. When, As here, A State Statute is at issue, the remedy for implementation that does Not Comport with the Civil Nature of the Statute is resort to the traditinal state proceedings that Challenge unlawful executive Action: If those proceedings fail, And the State Courts Authoritatively interpret the State Statute As permitting impositions that are indeed punitive, then the federal Courts can pronounce A Statute that on its face is civil to be Criminal

The ford federal Court may be reluctance, but must be the initial interpreter of State law. (see) Railroad Comm'n of Tex. v Pullman Co. 312 U.S. 496, 500-501 (1941)

Jul 16 06 10:42p   p.2



Ex21bit 2

## PROPOSED AMENDMENTS TO THE SEXUALLY VIOLENT PERSON'S ACT

The Definitions section of the Illinois Sexually Violent Person's Commitment Act is operationally vague and is allowing prosecutors to obtain civil commitment for persons who do not have the requisite "lack of control" over their conduct as required by the United States Supreme Court.

The substantive due process requirements under this type of civil commitment law have been addressed by the U.S. Supreme Court in <u>Kansas v. Hendricks</u>, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) and <u>Kansas v. Crane</u>, 534 U.S. 407, 122 S.Ct. 867, 151 L.Ed.2s 856 (2002).

In <u>Hendricks</u> the Court stated "These added statutory requirements serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond thei control." <u>Hendricks</u>, 521 U.S. at 358.

Four years after <u>Hendricks</u>, the Court again addressed civil commitment statutes similar to the Illinois SVPCA and ruled that a critical distinguishing feature of that 'serious ... disorder' "there consisted of a special and serious lack of ability to control behavior." <u>Crane</u>, 534 U.S. at 412-413.

Because the definition of "mental disorder" under the SVPCA does not contain this Constitutionally required language, the taxpayewrs of this state are paying an astronomical amount of money to confine persons who simply do not fit the Constitutionally crafted mold set forth by <u>Hendricks</u> and <u>Crane</u>.

Therefore, it is proposed that 725 ILCS §207/5(b) be amended to add the following language (as underlined);

(b). "Mental Disorder" means a congenital or acquired condition affecting the emotional or volitional capacity, <u>beyond the person's ability to control</u>, that predisposes a person to engage in acts of sexual violence.

For the same reasons set forth above, 725 ILCS §207/5(f) which defines what a sexually violent person is, should be amended to include the following underlined language;

(f) "Sexually Violent Person" means a person who has been convicted of a sexually violent offense, has been adjudicated delinquent for a sexually violent offense, or has been found not guilty of a sexually violent offense by reason of insanity and who is dangerous to others because he or she suffers from a mental disorder <u>that causes the person to suffer a special and serious lack of ability to control his or her sexual behavior</u> thus making substantially probable that the person will engage in acts of sexual violence <u>if not closely monitored while in the community and who, in extreme cases requires in-patient care for a set period of time in a secure treatment setting.</u>

This new language more closely tracks the U.S. Supreme Court decisions cited above and will serve to limit confinement to persons who lack control over their deviant sexual impulses.



Jul 16 06 10:43p                                      p.3

On October 2, 2003, the Illinois Supreme Court addressed the "lack of control" requirement under the Illinois Sexually Dangerous Person's Act. (725 ILCS §205.1.01.) In People v. Masterson, 2003 WL 22255606(Ill), the Court states that;
    "Illinois' SDPA and SVPA are obviously closely related in subject and proximity, and they are undoubtedly governed by one spirit and a single policy. Therefore, we believe it is merely a matter of legislative oversight that the SDPA has not been amended to make its terminology consistent with the SVPA."

725 ILCS §205/1.01 (of the Sexually Dangerous Person's Act) requires that the person subject to the petition must have a mental condition that has existed for a period of "not less than one year immediately prior to the filing of the petition".

The Sexually Violent Person's Act has no such provision. Instead, some men are serving in excess of twenty years in prison with not one prior mental health diagnosis of a sexual disorder and they are falling under the Sexually Violent Person's Act.

Affording the Sexually Dangerous Respondents this protection and not doing so under the Sexually Violent Peron's Act hardly signals "one spirit and a single policy".
Furthermore, SVP Respondents are being re-tried for their criminal offenses a second time because the basis upon which the mental health diagnosis is being made rests on the underlying crimes and not a genuine profound mental illness or disorder that creates a "special and serious" lack of control.

Therefore, it is proposed that the Sexually Violent Person's Act be Amended as follows;

Adding 725 ILCS §207/5(G) "To qualify as a sexually violent person, in addition to the elements set forth in Section 15 of this Act, the Petitioner is required to demonstrate beyond a reasonable doubt that; the person has suffered from a serious sexual mental disorder for a period of time of not less than one year immediately prior to the filing of the Petition under this Act."

*Read* *7* (This amendment would cause the SVPCA to track the Illinois Supreme Court decision of In Re Detention of Samuelson, 189 Ill.2d 548, 559, 727 N.E.2d 228, 235 (2000) which states that an SVP "Respondent cannot be involuntarily committed based on past conduct." and Similarly, the Illinois Supreme Court has previously held that involuntary civil commitment is prohibited unless the Respondent has a current diagnosis of a serious mental condition. See, In Re Michelle, 209 Ill.2d 328, 435(2004); In Re. Barbara H., 183 Ill.2d 482, 498(1998) and; People v. Jurisec, Ill.Sup.Ct. No. 89731, Opinion filed 2/22/02)

The following amendatory language is suggested for 725 ILCS §207/15(b)(1)(5).
The underlined section placing "lack of control" language into the elements the State must prove will cause the Act to more closely track Hendricks and Crane as detained above.

§207/15(b)(1)(5) "The person is dangerous to others because the person's mental disorders causes the person to have a special and serious loss of control over his sexual impulses and as a result creates a substantial probability that he or she will engage in acts of sexual violence"

The followingf amendatory language will promote compliance with the law where in many SVPCA cases, the State has failed to comply with the mandatory service requirements for serving a summons in a civil case. In a civil case, the only way that a court can obtain jurisdiction is by proper issuance of a summons.
(see State Bank v. Thill, 113 Ill.2d 294. "Absent a general appeance, a court can obtain personal jurisdiction only after proper service of process". "It is essential to the validity of a judgment that the court entering the judgment have jurisdiction of the subject matter of the litigation and jurisdiction over the parties." 113 Ill.2d at 308.

Adding the following amendatory language to §207/25(a) will ensure compliance with the Civil Practice Law;

§207/25(a) If the petitioner failes to effectuate proper service of summons under the Civil Practice Law, the Court shall dismiss the petition for lack of jurisdiction.

The following amendatory language is suggested for 725 ILCS §207/30(b) under the "detention and Probable Cause" Section of the SVPCA. In numerous cases, the mandatory times frames within which a person detained is to be provided his due process probable cause hearing have been completely ignored. In several cases, detainee's have languished in custody for years without the benefit of a probable cause hearing that by the dictates of Section 30(b) must be conducted within "72 hours excluding saturdays, sundays and legal holidays. The Court may grant a continuance of the probable cause hearing for no more than 7 additional days upon the motion of the respondent, for good cause."

Adding the following amendatory language to §207/30(b) will provide a remedy when the State does not comply with this mandatory provision.

§207/30(b) "...If the person is not afforded a probable cause hearing within the specified time period herein, absent a written waiver of rights in open court accompied by the court admonishing the Respondent as to his right to a speedy probable cause hearing within the time frames set forth, the court shall dismiss the petition with prejudice."

(see Gerstein v. Pugh, 420 U.S. 103 mandatory probable cause hearing within 48-hrs of detention).



-3-

Backtracking, the Hendricks decision sets forth that these types
of civil commitment laws are pointed at "recidivists" however,
the Illinois SVPCA does not have any such caveat. In that decision,
the Supreme Court said;

> "It is enough to say that there must be proof
> of serious difficulty in controlling behavior and
> this, when viewed in light of such features of the
> case as the nature of the psychiatric diagnosis
> and the severity of the mental abnormality itself,
> <u>must be sufficient to distinguish the dangerous sexual
> offender whose serious mentalk illness, abnormality
> or disorder subjects him to civil commitment from the
> dangerous 'but typical recidivist' convicted in an
> ordinary criminal case.</u>" 521 U.S. at 357-8.
> (see also, Foucha v. Louisiana, 504 U.S. 71, 82-3.

To avoid the SVPCA being invoked against a first offender who is
not a "recidivist", the following amendatory language to the Act,
Section §207/15(c)(2) Under contents of what must be alleged in the
SVP Petition is currently blank.
Proposed language for 725 ILCS §207/15(C)(2) (currently blank);

> §207/15(c)(2) "<u>That the person is a recidivist having
> been previously convicted in this or any other state
> of any offense or equivalant offense as set forth in
> Section 5(e) and that the person was previously
> imprisoned, jailed or placed on probation for a sexually
> violent offense. No person who is a first offender
> shall qualify for commitment under the Act.</u>"

Because the Illinois Supreme Court in Masterson ruled that the
Sexually Dangerous Person's Act and the Sexually Violent Person's
Act share one spirit and a single policy, it is imperative that
rights afforded to one group be made available to the other.
The Sexually Dangerous Person's Act ensures that mental health
recommendations for commitment come from "two qualified psychiattrists"
whereas no such protection is afforded to persons falling under the
purview of the Sexually Violent Person's Act. (see 725 ILCs §205/4).
Person's referred for commitment under the SVP Act are interviewed
by a single psychologist.
Accordingly, the following amendatory (added) language is
submitted;

> §207/10(c)(adding subsection "4") "<u>The comprehensive
> evaluation shall be conducted by no less than two
> qualified psychiatrists who are approved by the
> Sex Offender Management Board.</u>"

> §207/35(b) ...psychologists (replaced with "<u>psychiatrists</u>"

In numerous trials, SVPCA Respondents are faced with having to
defend against the original allegatios that resulted in the original
conviction. Prejudicial facts regarding the underlying crimes
tend to nullify triers of fact and distract from the central issue
(e.g., "does the person have a volitionally impairing mental
disorder that renders him/her dangerous beyond their control?")

-4-



The graphic details of the underlying crimes provide absolutely
no probative details but rather, serve to inflame the passions
and prejudices of juries and cause Respondents to be found
SVP wrongly and not for the mental disorder issue but for
the crimes for which a full sentence has already been served.

At least two Illinois Appellate Courts have determined that
introduction of victim testimony or of prejudicial crime
facts rendered the trials unfair.
The Courts in People v. Winterhalter,313 Ill.App.3d 972, 979
(3rd Dist. 2000) and People v. Stoddard, 82 Ill.App.3d 736
as well as In Re Biggs, 5-01-0476 (5th Dist. 2003) stated
that the best method of presenting evidence of past crimes
is by introduction of certified copies of convictions.


Adding the  following amendatory language to the SVPCA will
serve the interests of judicial economy and will help juries
remain focused on the Respondent's "present" mental condition.

725 ILCS §207/35 (adding) (b)(1) "The petitioner may not
introduce factual information setting forth particulars
of the underlying crimes other than the official certified
copy or copies of conviction(s) and mittimi."


        In many cases SVPCA Respondents served far less times in
prison than they have under detention/commitment as an SVP.
This is demonstrative that the law is being used by prosecutors
to extend incarceration rather than to attain the legitimate
goal of treatment and release.

As such, limitations on the duration of civil commitment
should be amended into the Act.
The following amendatory language is submitted to meet this
goal;

725 ILCS §207/40)(a) (adding (1) "The duration of the commitment
to the Department shall not exceed a period of two years of
confinement in a secure facility. If a person is placed on
conditional release, that period shall not exceed 18 months."


The Department of Human Services has been the subject of numerous
lawsuits based upon the miserable prison-like conditions of
confinement being imposed upon detained and committed persons.
Most recently (as of June 19, 2006), the Department has transferred
numerous SVP's to the "super-max" prison at Rushville, Illinois.
The Act requires that these "patients" be held under the "least
restrictive conditions of confinement" however, the Department
has systematically and systemically ignored this statutory mandate.

Therefore, the following amendatory language is submitted to ensure
that these person's are not imprisoned, treated as prisoners
or subjected to rules and discipline in the same manner as
prison inmates are.



725 ILCS §207/40(b)2,,,continuing...."For purposes of this Act, the term "least restrictive" means "less restrictive conditions than those found in minimum security prison facilities.In such cases where the Department seeks to segregate a committed person or in any way restrict his property rights, communication rights or visitation rights, the Department shall first seek an Order from the Committing Court. In cases of emergencies, the Department may impose restrictions for no more than 72 hours excluding saturdays, sundays and legal holidays and in any event, the Court shall not authorize the Department to impose restrictions on property, communication, visitation or other general rights for a period exceeding 30 days.The Court must find that the restriction is logically related to the circumstances alleged by the Department."

The standard for obtaining condition release is improper where the burden of proof on the State shifts from "beyond a reasonable doubt" to the lesser standard of "clear and convincing" (Compare 725 ILCS §207/35(f) to §207/60(d))
The U.S. Supreme Court in Hendricks in determining that the Kansas SVP Act was constitutional elaborated on the fact that "If Kansas seeks to continue the detention beyond that year, a court must once again determine beyond a reasonable doubt that the detainee satisfies the same standards as required for the initial confinement" see 138 L.Ed2d at 516).

Therefore, amendatory language to Section §207/60(d) should strike the "clear and convincing standard" and amend it with the words "beyond a reasonable doubt".

The foregoing suggested amendments will allow the Act to better comport with Constitutional standards; will relieve over-crowding and cost prohibitive staffing needs and will at the same time continue to vigorously protect the public while at the same time will better protect the rights of persons subject to proceedings under the Illinois SVPCA.




*I distribution to legislative re: this at this facility*

EXzibit 3

## Summary on Inadequate Mental Health Treatment & Housing
## Illinois Department of Human Services
### Sexually Violent Persons – prepared by Deborah Maxey

**Program Overview:**

The Illinois Department of Human Services ((IDHS) and Joliet Treatment & Detention Center and the Rushville State Correctional Center administer the Sexually Violent Persons (SVP) Program. SVP is defined as a person that has been found guilty of a sexually violent offense, and has a mental disorder that makes the individual likely to re-offend. IDHS should never house its SVP detainees in local jails or prisons because they are consider as detainees with a mental disorder. The IDHS has accepted 120 pre-trial detainees and estimated 140-convicted SVP detainees at Joliet facility.

The pre-trial detainee while awaiting probable cause hearing or trial, remains at IDHS SVP unit but does not receive treatment. But a SVP does have a right to be placed in a mental health or medical facility instead of prison, especially if the prison system has failed to provide appropriate psychiatric care and maintenance. So, why did IDHS transfer 120 pre-trial detainees back into a maximum-security prison?

Now, an individual who is a SVP, they either remain at the SVP unit for "indefinite period of time" at Rushville Correctional Center or Joliet facility, and "few" are integrated into the community. The IDHS is not meeting their obligations under the law act to provide mental health treatment to SVP in a state hospital or medical facility. IDHS is also failing to meet their mission statement "when you come here, you will receive mental health treatment, and return back to your community to live". Annually, a SVP may petition the court to be released from the program or to be moved to a less restrictive setting. According to American Civil Liberties Union (ACLU) of Illinois, "while scores of individuals are committed to the Joliet facility, only a few have successfully completed a treatment course making them eligible for release".

IDHS has failed to develop and implement a plan that insures persons held under the SVP commitment act receive meaningful mental health treatment while being held in custody.

Specific complaints notes that IDHS has failed:

| | Complaints & Suggestive Options for Housing Issues |
|---|---|
| 1) | SVP never advance through treatment programs depending on their progress. |
| 2) | Since 1998, a few residents have entered into an Intensive Community Treatment, Surveillance and Reintegration program. |
| 3) | Lack of properly trained staff regarding treatment of sexual deviance. |
| 4) | Lack of meaningful individualized treatment program for each detainees, complete with a series of steps necessary for treatment and release. |
| 5) | To develop reasonable fair grievance procedures under the term of the commitment law. |
| 6) | To allow residents with educational, religious, legal, vocational services and materials. |
| 7) | As part of treatment, residents are forced to make false statements of imagined criminal acts. |
| 8) | No basic therapist and patient confidentiality. Pre-detainess are instructed by their |

| | attorney to not commit to group therapy. |
|---|---|
| 9) | SVP are routinely strip-searched, regularly shackled with heavy restraints, denied freedom of movement, barred from purchasing products. |
| 10) | Develop more Transitional Housing or Programs statewide as alternatives in consultation with nongovernmental organizations with expertise in meeting the psychological, job training, and housing needs of SVP detainees. |
| 11) | Residents are raped and sexually abuse and staff promotes a homosexuality environment among residents. |
| 12) | Cruel & physical mistreatment at the hands of correctional officers by forcing medical injection and shackled detainees. Note that these are detainees held for rehabilitative and mental treatment not criminal. |
| 13) | Medical and dental care is substandard in facility-holding detainees. |
| 14) | Increase the GPS surveillance to improve the conditional release of being supervised release to community organizations or family members; regular reporting requirements, or bail or bond option for eligibility for transitional programs. (According to IDOC that there are 100 out 1,000 individuals eligible for GPS. There is a total of 18,000-registered S.V.P. in Illinois. Registration does not means supervision for SVP) |
| 15. | Early detection of individual while in DOC custody to avoid this civil commitment act. (IDHS stated that there is no standard screening process to identify a SVP. |
| 16. | Who is responsible for releasing SVP to conditional release under the commitment act? IDHS, Attorney General Office, or Judge who sentence the detainee. |

**Does the state have a quality sex offender treatment program?** Does it involves:
- Cognitive behavioral model focus on relapse prevention
- Ratio number of patients and number of qualified trained staff
- Individualized treatment plan and intensive treatment settings in a medical facility. (According to IDHS, plan consists of victim empathy, ??????

The highly influential 1997 Hendericks decision by the U.S. Supreme Court arose from Kansas (Kansas v Hendericks, 117 S. Ct. 2072, (1997). In the Court ruling, the State to provide treatment that is available for "mental disorders" that "treatable'. In some SVP states, the treatment settings are in the follows:

- State Hospitals – 60%
- GPS-monitored in Transitional Housing & Rehabilitation Programs

### Census History for SVP's by Fiscal Year

| | 1998 | 2005 | July 2006 |
|---|---|---|---|
| Pretrial Detainees | | | 140 |
| Full Confinement | 25 | | 140 |
| Less Restrictive Alternative (LRA) Program – Conditional Release | | | 18 (3 individuals returned back to IDHS because of lack of housing) |
| Total number of admission to IDHS per month | | 2 to 3 | 5 to 6 |

As seen by the above chart, the number of individuals assigned to the LRA Program has not changed, from 95% of the total SVP remained housed at these correctional centers. According to Dr. Lorrie Rickman Jones, Director of Mental Heath, 'we'll outgrown the Rushville center in 2010".

**Program Funding**
The SVP Program is entirely funded from the State General Fund. In FY 2006, the program received $27 million in funding for startup cost to operate the Rushville Correctional Center. This is an increase of $19 million from FY 2005. As of 2006, it cost the state $83,000 per person

**Performance Measures**
The only performance measure used to assess the effective of the SVP program is the SVP Program Year-End Census resulting into 1% release in conditional release of a detainee. Clearly there needs to be measure assessing the effective of the Less Restrictive Alternative Program to integrate individuals into the community. Measures could include:

- Re-offender rates
- Percentage of participants with full-time jobs
- Number of participants living in community based housing
- Percent of failing drug test and psychologist test.

The State must invest sufficient resources in treatment to develop release programs. The State could contract with State Mental Hospital who offers Sex Commitment Program to undertake a pilot program of supervised "pre-trial detainees" to assist IDHS in their 'overcrowd" condition. Majority of these detainees are complying with all

court appearance and this could reduce their transportation costs. We must move against purely punitive approach to continuously confine these individuals in prisons and jails, recognizing that these individuals as well as society are best served when these mentally ill offenders are provided necessary mental health services and programs while incarcerated and provide post-release support upon release.

Given the fact that Rushville Correctional Center was designed as a maximum-security prison and to transfer "mental patients" into this type of facility is another form of punishment.

**VI.**   **Relief:**

State briefly exactly what you want the court to do for you.  Make no legal arguments.
Cite no cases or statutes.

$10 million in damage in lost liberty, pain &
Suffering, IN the violation of my Constitutional
Rights, IN being denied of my Due process Rights

## CERTIFICATION

By signing this Complaint, I certify that the facts stated in this
Complaint are true to the best of my knowledge, information
and belief. I understand that if this certification is not correct,
I may be subject to sanctions by the Court.

Signed this **12** day of **Dec**, 20**07**

_Ronald Levi_
(Signature of plaintiff or plaintiffs)

 RONALD A. Levi   civil detainee
(Print name)

871231
(I.D. Number)

RR1 Box 6A
Rushville, IL 62681
(Address)

Revised 4/01